### In re CORAL PETROLEUM, INC., Debtor.

### CORAL PETROLEUM, INC., Plaintiff,

v.

### Banque PARIBAS, Defendant,

### MBank Houston, N.A., Defendant Intervenor.

Bankruptcy No. 83–02460–H2–5. Adv. No. 83–1953–H1.

United States Bankruptcy Court, S.D. Texas, Houston Division.

June 17, 1985.

Michael L. Cook, Dennis J. Drebsky, Timothy A. Nelson, Sally M. Henry of Skadden, Arps, Slate, Meagher & Flom, New York City, Lenard M. Parkins, Patrick L. Hughes of Sheinfeld, Maley & Kay, Houston, Tex., for plaintiff, Coral Petroleum, Inc.

Peter Langerman, Bruce Zirinsky of Weil, Gotshal & Manges, New York City, Alfredo R. Perez of Bracewell & Patterson, Houston, Tex., for defendant, Banque Paribas.

Frank LaBudde of Dotson, Babcock & Scofield, Houston, Tex., for defendant-intervenor, MBank Houston N.A.

Daniel H. Johnston, Jr., Mark Shaiken of Ross, Banks, May, Cron & Cavin, Houston, Tex., for Official Creditors Committee of Coral Petroleum, Inc.

## MEMORANDUM OPINION AND ORDER

MANUEL D. LEAL, Bankruptcy Judge.

This matter, before the Court on plaintiff Coral Petroleum's complaint for a declaratory judgment raises several complex issues. The major issues are whether a 30 million dollar promissory note is to be clas-

sified as an instrument or a general intangible under the Uniform Commercial Code and whether the defendants Banque Paribas and MBank, N.A. properly perfected their security interests in the promissory note so as to prevent the debtor from avoiding their respective interests under 11 U.S.C. § 544. Because the Court concludes that the promissory note is an instrument, and because defendants Banque Paribas and MBank, N.A. did not take possession of the note or satisfy the requirements of establishing constructive notice pursuant to U.C.C. § 9–305, the Court holds that their respective interests are unperfected and the debtor can recover the proceeds pursuant to 11 U.S.C. § 544. Accordingly, the declaratory relief sought by the debtor is GRANTED and the motion to dismiss is DENIED. Intervenor MBank's motion is also DENIED.

Debtor Coral Petroleum, Inc. commenced this adversary on July 8, 1983, by filing a complaint seeking a declaratory judgment that a lien on a promissory note held by Banque Paribas, defendant herein, (hereinafter "Paribas") is voidable under § 544(a) of the Bankruptcy Code of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984. By answer dated October 4, 1983, Paribas moved for dismissal of the complaint in all respects, claiming that its interest in the promissory note was superior to all other claimants. MBank Houston, N.A. (hereinafter "MBank") intervened in the adversary by court order entered on January 30, 1985, requesting that its interests be recognized as superior to, or equal to, Paribas' interests. The trial was held on February 27, 1985; as a preliminary matter, Coral was allowed to amend its complaint by oral motion to include a preference cause of action which was then severed from this trial by court order. The parties filed extensive pre- and post-trial memoranda of law. The Official Creditor's Committee appeared and participated at the trial and submitted a post-trial memorandum of law pursuant to 11 U.S.C. § 1109(b). The court

heard evidence and arguments of counsel and makes the following findings of fact and conclusions of law:

Coral Petroleum, Inc., a Texas corporation with its principal place of business in Houston, filed a petition under Chapter 11 of Title 11 of the United States Code (Bankruptcy Code) on June 2, 1983, and is operating its business as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108. Prior to the filing of the petition, Coral's principal business was marketing and trading crude oil and petroleum products in the domestic and international market. Coral was engaged in virtually all aspects of the crude oil and petroleum business by virtue of its subsidiaries and other affiliated corporations. (Adm.3)[1] Paribas, the defendant in this action, is a banking corporation organized under the laws of France. (Adm.5) Paribas transacts business in the United States at its branch office located in New York, New York. (Adm.5) MBank, the intervenor in this action, is a banking corporation organized under the laws of the State of Texas with its principal place of business in Houston. MBank is the successor in interest to Capital Bank N.A., and Capital National Bank. (Stipulation of fact concerning MBank)

### THE TRICENTROL NOTE

On or about September 17, 1982, Coral Petroleum Development, Inc., a Texas corporation and a wholly owned subsidiary of Coral, sold substantially all of its United States oil and gas producing properties to Tricentrol Resources, Inc., a Delaware corporation. (Adm.7, Tr. 45) In return, Tricentrol Resources, Inc., made and delivered to Coral Development, Inc., an interest-bearing installment promissory note in the principal amount of 30 million dollars (hereinafter "Tricentrol Note"). The obligation of Tricentrol Resources, Inc., under the note was guaranteed by its parent corporation, Tricentrol, PLC., pursuant to a written guarantee. (Adm. 10, 11, Coral Exh. 2)

---

1. For the purposes of this opinion, the abbreviations have the following meaning: Tr.—Trial transcript; Adm.—Coral Petroleum's Request for Admissions.

On the same day, Coral Development, Inc., assigned the Tricentrol Note to Coral Petroleum, Inc., in consideration for intercompany advances. (Coral Exh. 3)

On September 17, 1982, Coral entered into a credit agreement with the First National Bank of Chicago (hereinafter "First Chicago") pursuant to which First Chicago agreed to lend Coral up to 30 million dollars. (Coral Exh. 4) Simultaneously, Coral made and delivered to First Chicago its interest-bearing installment promissory note (hereinafter "Coral Note") in the principal amount of 30 million dollars. (Adm. 16) As security for this loan, Coral pledged among other things, the Tricentrol Note to First Chicago, delivered possession of the Tricentrol Note to First Chicago and executed a security agreement for the $30 million amount. *Id.* Coral's borrowing under the credit agreement totalled 27 million dollars and on February 18, 1983, both the Coral Note and the credit agreement were amended to reflect Coral's having borrowed 27 million dollars. (Coral Exh. 7 Amended Agreement) From October 27, 1982, to August 1, 1983, the note was in the exclusive physical possession of First Chicago in Chicago, Illinois. (Adm. 20)

The Tricentrol Note, although transferred three times, contained the following limitation on transferability:

> This Note is not negotiable and may not be sold, assigned, endorsed or pledged in whole or in part by the Payee, except that (i) it may be pledged to First National Bank of Chicago or any other banking institution approved by the Company, which approval shall not be unreasonably withheld, as security for a loan made by such institution (the "Pledge") to the Payee, provided the Pledgee agrees in writing with the Company that it will not further sell, assign, endorse or pledge, or issue or grant any participations in, this Note, except to the extent specifically required by applicable law or as it may be transferred as a result of a foreclosure after an event of default by the Payee with respect to its obligations to the Pledgee, and (ii) it may be assigned to Coral Petroleum, Inc., ("Coral") or any directly or indirectly wholly-owned subsidiary thereof, provided such transferee or assignee agrees in writing to be bound by all of the provisions hereof and makes in writing the representation and warranty contained in paragraph 4 hereof.

The Note is unique in that it incorporates the law of the United Kingdom only in so far as a definition which is taken from the United Kingdom Companies Act, 1948, for excluded subsidiaries. (Coral Exh. 1, Para 7c)

## PARIBAS FINANCIAL ARRANGEMENTS WITH CORAL

Banque Paribas and Coral entered into several loan agreements. On July 31, 1981, Coral borrowed 24.5 million dollars from Banque de Paris de Pays-bas (predecessor to Banque Paribas) coupled with a 10.5 million dollar loan from the Royal Bank of Canada. Paribas was granted an interest in certain collateral, including the following: "(iii) all other personal property now owned or hereafter acquired by the company, of every kind and description, tangible or intangible, including but not limited to, all money, goods, instruments, securities, documents, contract rights, patent and trademark rights, general intangibles, credits, claims demands and any other property, rights and interests of the company; (iv) any and all proceeds of the foregoing." (Paribas Exh. 3)

Paribas and Coral entered into a second loan agreement on August 30, 1982, in which Paribas lent Coral the principal amount of 40 million dollars, secured by a security agreement in certain collateral.

On January 27, 1983, a third loan was entered into between Coral and Paribas whereby Paribas loaned Coral 15 million dollars. In return, Coral granted Paribas a security interest in certain artwork that it owned and made two stock pledges, one of stock in Coral Petroleum Canada, Inc. and the other of stock in Coral Petro Development, Ltd., a Canadian Company. At the closing on January 27, 1983, of the 15 mil-

lion dollar loan, Mr. Sudhaus, vice-president of Coral, signed a letter agreement[2] which assigned all the payments received by Coral from the Tricentrol Note to Paribas. (Coral Exh. 12) Mr. Sudhaus testified that Coral was willing to grant Paribas a security interest in the Tricentrol Note but never executed a document which specifically said that the excess funds of the Tricentrol Note would be "specific security" for the 15 million dollar loan. (Tr. 55–56) Following the closing of the 15 million dollar loan, Paribas filed a financing statement with the Texas Secretary of State relating specifically to Coral's artwork. (Coral Exh. 24) Paribas also sent a letter to the gallery which held the artwork requesting that it sign an agency agreement designating Paribas as the secured party. (Coral Exh. 53) However, no such filing or agency agreement was sent to First Chicago by Paribas with respect to the Tricentrol Note. (Tr. 109–10) Mr. Forbes, a loan representative at First Chicago, testified that it was standard banking practice to obtain internal approval from senior management and a written agency agreement signed by all parties when a bank acts as agent or bailee for another secured party with respect to instruments in its possession. (Tr. 78–80)

Paribas perfected its security interest in Coral's general intangibles by filing statements with the Secretary of State of Texas on March 9, 1979, August 10, 1981, and October 27, 1981.

### MBANK'S CLAIM TO THE TRICENTROL NOTE PROCEEDS

On January 18, 1977, Coral Petroleum, Inc., and Capital National Bank executed a security agreement in which Capital was granted a security interest in:

[a]ll of the personal property and fixtures of the Debtor wherever located and whether now owned or in existence or hereafter acquired or created, of every kind and description, tangible or intangible, including, without limitation all inventory, equipment, farm products, documents, instruments, chattel paper, accounts, contract rights and general intangibles, such terms having the meaning ascribed by the Uniform Commercial Code. (Coral Exh. 37).

MBank lent Coral 3 million dollars pursuant to a 1 million dollar promissory note executed on March 24, 1983, and a 2 million dollar promissory note executed on April 8, 1983. On February 11, 1977, MBank filed its financing statement covering Coral's general intangibles and instruments with the Secretary of State of Texas. (MBank Stip. 3) On January 21, 1982, MBank filed a continuation statement with the Texas Secretary of State, as to its security interest. (Stip. 4)

### THE INTER–CREDITOR AGREEMENT[3]

On August 29, 1980, several of the creditors of Coral, each of whom held perfected security interests in the same collateral, executed an inter-creditor agreement which provided, in essence, that a creditor with a "specific security interest" has "priority to the extent of all obligations, direct or contingent, of the debtor to such creditors secured thereby over any general collateral." The inter-creditor agreement was signed by Banque de Paris et des Pay-Bas (now Banque Paribas), and Capital National Bank. First National Bank of Chicago was made a party to the inter-creditor agreement on or about February 18, 1983. (There was no testimony as to the events leading to First Chicago's joining this agreement.)

### THE SALE OF THE TRICENTROL NOTE TO FIRST CHICAGO

After filing its petition, Coral and First Chicago entered into an agreement whereby Coral was to sell the Tricentrol Note to First Chicago for 28.5 million dollars. The sale of the note would allegedly yield a surplus of 1.9 million dollars. First Chicago and Coral had negotiated the agreement

2. The letter agreement is reprinted in Appendix A.

3. The text of the Inter-Creditor Agreement is reprinted in Appendix B.

prior to bankruptcy and were set to close the transaction on June 2, 1983, before the bankruptcy petition was filed. At that time, Mr. Sudhaus, vice-president of Coral, was located at Banque Paribas offices in New York. He asked Mr. Boyd and Mr. Forbes to meet him at Paribas' offices to close the transaction. There was conflicting evidence as to whether Paribas indicated its interest in the Tricentrol Note at that time. Both Boyd and Forbes testified that the subject of Paribas' interest did not come up in conversation on June 2, 1983, even though Paribas was well aware of the sales transaction involving the Note. (Tr. 77–78, 88) Mr. Aiello, vice-president and general counsel of Paribas, testified that he mentioned to either Boyd or Forbes or both that Paribas had a "piece of the pie" on the surplus of the note. (Tr. 105) On the following day, June 3, 1983, Mr. Aiello sent a telex to First Chicago informing them that Paribas claimed an interest in the surplus of the Tricentrol Note.[4]

Coral sought the approval of the bankruptcy court on the sale of the Tricentrol Note and Guarantee to First Chicago. Banque Paribas asserted that it was entitled to the proceeds of the Tricentrol Note by virtue of a junior security interest. The parties entered into a stipulation styled a partial compromise which was approved by the Honorable E.H. Patton, Jr., on August 1, 1983. Coral was allowed to sell the Tricentrol Note free and clear of all liens asserted on the Note to First Chicago with "any and all asserted liens, encumbrances, security and other interests in or to the Tricentrol Note attach (sic) to the surplus proceeds generated by the sale of the Tricentrol Note...." (Stipulation Partially Compromising Controversy, para. 2 at p. 2). The surplus was remitted to Paribas pending the determination of the validity of Paribas' alleged interest. The order stated that if any court finds Coral to be entitled to the funds, Paribas will remit them with interest from the date of delivery to the date of disgorgement. The order provided the opposite result if Paribas prevailed.

4. The telex is reprinted in Appendix C.

Nothing in the order was to prejudice the right of any party to come in and make a claim to the surplus funds. *Id.*

Coral argues that the Tricentrol Note must be classified as an instrument under the Uniform Commercial Code. If this is the case, Paribas and MBank hold unperfected interests in the note due to their lack of possession of the Note. Paribas and MBank argue the note must be classified as a general intangible, and, as such, their respective filings operated to perfect their respective interests in the proceeds of the Tricentrol Note. Paribas further argues that it alone is entitled to the proceeds because the side letter of January 27, 1983, created a specific security interest which entitled Paribas to priority over Coral's other creditors pursuant to the terms of the inter-creditor agreement outlined above. MBank argues that this letter did not create a specific security interest and Paribas must share the proceeds of the Tricentrol Note pro-rata with all the other creditors who had an interest in the note. MBank further argues that a proportion of Paribas' interest is subordinate to MBank's by virtue of Paribas' actions in exempting certain loans made to Coral from the inter-creditor agreement. Finally, Paribas and MBank assert that if this Court finds the Tricentrol Note to be an instrument, as Coral alleges, they perfected their interest by notice to First Chicago.

## CONCLUSIONS OF LAW

This Court has jurisdiction under 28 U.S.C. § 1334. The adversary proceeding is properly before this court pursuant to Bankruptcy Rule of Procedure 7001(9). The declaratory judgment remedy is an all purpose remedy designed to permit an adjudication whenever the court has jurisdiction, there is an actual case in controversy and adjudication would serve a useful purpose. *Allstate Insurance Co. v. Employers Liability Assurance Corp.*, 445 F.2d 1278, 1280 (5th Cir.1971).

The Court is faced with the issue of determining whether the federal right granted in 11 U.S.C. § 544(a) is a core or non-core matter under the 1984 Bankruptcy Amendments and Judgeship Act. The distinction between core and non-core is an important one for it determines whether the bankruptcy judge can enter a final judgment in a case or must submit proposed findings of fact and conclusions of law for *de novo* review by the district court.

28 U.S.C. § 157(b)(2)(K) states that a proceeding to determine the "validity, extent and priority of liens" is a core proceeding. However, since this section must be strictly interpreted, it is proper for the Court to require a sufficient nexus with the bankruptcy estate before finding that a lien dispute is a core matter. The legislative history is instructive for it indicates that Congress intended core proceedings to include all proceedings integral to the restructuring of debtor-creditor rights, whether or not they involve questions of state law. 130 Cong.Rec. E1107–10 (daily ed. March 20, 1984). Whether this action is a core proceeding is to be determined by the bankruptcy judge, 28 U.S.C. § 157(b)(3) (1984), and "a determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by state law." *Id.*

A declaratory judgment action which requires the court to interpret state law in deciding whether the debtor can assert his avoidance powers is a proceeding which is integral to the restructuring of debtor-creditor rights. "The rights, remedies and powers afforded the trustee through § 544 are necessary and important items in the trustee's efforts to secure all the debtor's property for an equal distribution according to the terms of the Code." 4 *Collier on Bankr.* § 544.01 at 544–3 (15th ed. 1979).

Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5963, 6296–97. Congress, in § 544, created a federal right when it gave "a bankruptcy trustee, as of the petition date, the status of a judicial lien creditor." *Matter of Quality Holstein Leasing,* 752 F.2d 1009, 1012–13 (5th Cir.1985). Even though the rights and priorities accorded to a judicial lien creditor are determined by reference to state law, it is federal law which gives the debtor the right to step into the shoes of the judicial lien creditor in order to effectuate the congressional policy of equality of distribution to creditors. The Fifth Circuit has enforced this view in the *Quality Holstein* case by referring to the bankruptcy court's holding which the district court affirmed on similar grounds. The omission by the Fifth Circuit of any reference to non-core aspects in that case can reasonably be interpreted as an affirmation of the fact that the rights granted in 11 U.S.C. § 544(a) are core determinations. Since that case is a classic example of § 544 rights, "the trustee seeks to avoid the security interest of a creditor that has failed to perfect its secured position." *Matter of Quality Holstein Leasing, supra* at 1013 n. 8, as is this one, this Court is bound to adjudicate this matter as a core proceeding. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(K) to determine the "validity, extent and priority of liens" when the estate claims the liens in question should be avoided under 11 U.S.C. § 544 to allow the funds to become property of the estate under 11 U.S.C. § 541.

There is an actual case in controversy because the creditor banks' argue that they are entitled to the funds. Adjudication would serve a useful purpose due to the fact that a favorable or adverse ruling for the debtor would increase or diminish the estate, thereby affecting the payout to the debtor's unsecured creditors. Under 11 U.S.C. § 544(a) the rights of a judicial lien creditor are to be determined by state law. *Angeles Real Estate Co. v. Kerxton,* 737 F.2d 416, 418 (4th Cir.1984); *In re Clifford,* 566 F.2d 1023, 1025 (5th Cir.1978). The state law applied is the Uniform Commer-

cial Code which has been adopted in every state except Louisiana.[5]

The classification of the Tricentrol Note is crucial for it determines which state law this Court is to apply and the procedure for perfection under U.C.C. § 9–103. The Tricentrol Note provides that it will be governed and construed in accordance with the laws of the State of New York. However, U.C.C. § 1–105(2) provides that if one of the provisions of this Act specifies the applicable law, that "provision governs and a contrary agreement is effective only to the extent permitted by the law ... so specified." The choice of law provision of Article 9 is such a provision. U.C.C. § 9–103(1)(b) provides that perfection of an instrument is governed by the law of the jurisdiction "where the collateral is when the last event occurs on which is based the assertion that a security interest is perfected or unperfected." The parties are in agreement that the Tricentrol Note was in Illinois when Mr. Aiello asserted that Paribas had an interest in the note. Therefore, Illinois law would apply if the note is deemed to be an instrument. If the Note is found to be a general intangible, the parties are in agreement that Texas law would apply because § 9–103(3)(b) provides that "the law ... of the jurisdiction in which the debtor is located governs the perfection ... of the security interest."

An instrument is defined in U.C.C. § 9–105(1)(i) as:

a negotiable instrument or a certified security or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment.

A general intangible is defined in U.C.C. § 9–106 as:

any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money.

The question of whether a particular document qualifies as an instrument under the U.C.C. is a question of law. This is necessitated by the purpose of the U.C.C. which is to "simplify, clarify, and modernize the law governing commercial transactions". U.C.C. § 1–102(2)(a); *First National Bank in Grand Prairie v. Lone Star Life Insurance Co.*, 524 S.W.2d 525, 533 (Tex.Civ. App.—Dallas), *writ. ref'd n.r.e.*, 529 S.W.2d 67 (Tex.1975).

The parties agree that the Tricentrol Note is not negotiable because it is not payable to bearer, and it is not a certified security. However, Coral alleges it is an instrument because it evidences a right to the payment of money and is not itself a security agreement or lease. The Banks' argue that the note is not an instrument because of its limitations on transferability and its unique nature, that is, its extremely limited incorporation of the law of the United Kingdom, in so far as the definition of excluded subsidiaries.

The language "of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or assignment" is to be "construed broadly to include any writing which is treated as a token of the rights it represents and therefore is normally delivered to any person to whom the rights are transferred." *First National Bank in Grand Prairie v. Lone Star Insurance Co., supra* at 533. In that case, the bank argued that a certificate of deposit which bore the restrictive legend "non-negotiable" prevented the certificate from being transferred in the ordinary course of business by delivery or endorsement. The court rejected this argument and held as a matter of law that the certificate is "of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment" because "it may easily be delivered by one party to another in the course of a

---

**5.** Since the law is identical in the respective states involved, all citations will be to the Uniform Commercial Code.

commercial transaction." *Id.* at 534. The Arkansas Supreme Court relied heavily on the *First National Bank* case when it ruled, under Arkansas law, that "the fact that the certificates were non-negotiable and non-transferable in no way prevents them from being instruments." *General Electric Co. v. M & C Manufacturing, Inc.,* 283 Ark. 110, 671 S.W.2d 189, 190 (1984). See also *Citizens National Bank of Orlando v. Bornstein,* 374 So.2d 6, 10 (Fla.1979) ("We do not consider the restrictions on assignability requiring consent of and recorded transfer by the bank to exempt this certificate from the broad coverage of section 675.105(1)(g) (instrument).") A commentator has suggested that the test to determine whether a writing is transferable in the ordinary course of business turns on what professionals ordinarily would do to transfer an interest in the claim evidenced by the writing in question. Harris, *Non-negotiable Certificates of Deposits: An Article 9 Problem,* 29 U.C.L.A. L.Rev. 330,372 (1981). The test turns on findings as to the current usage of the market place. *Id.* If professionals who deal with a writing attach importance to possession of the writing, then the law likewise should attach significance to possession. *Id.* at 376.

■ The weight of authority holds that the language "of a type which is in ordinary course of business transferred by delivery" includes a writing that requires a specific procedure for transferability. The Tricentrol Note is of the "type" under U.C.C. § 9–105(1)(g) because "type" is to be interpreted broadly. The Note was transferred from Coral Development to Coral Petroleum to First Chicago, and sold to First Chicago. This Court is convinced by existing legal authority and the evidence that in order to transfer an interest in the Tricentrol Note, a professional would deliver the writing with the necessary indorsements and assignments. The evidence at trial indicated that all the parties to the lawsuit attached legal significance to possession of the Tricentrol Note. Mr. Aiello testified that he was pleased he told First Chicago of Paribas interest on the day of the filing. (Tr. 107). This comment would support Paribas' constructive possession theory and establishes that Paribas' representative perceived the Tricentrol Note as an "instrument." For the above mentioned reasons, this Court concludes the Tricentrol Note is an "instrument."

The Bank's argument that the Tricentrol Note is a general intangible must be rejected for the parties have cited no caselaw to support this view. The Second Circuit has stated:

> The drafters of the Code classified collateral mainly according to the nature or use of the underlying entity, rather that the character of its ownership at any given time. Significantly, the examples of "general intangibles" given in the official comments are *all* types of property that are inherently intangible.

*Feldman v. First National City Bank,* 486 F.2d 367, 372 (2d Cir.1973)

The Official Comments state that examples of general intangibles are "goodwill, literary rights and rights to performance. Other examples are copyrights, trademarks, patents...." Section 9–106 Official Comments. Since the Tricentrol Note is none of the above, this Court cannot classify it as a general intangible.

U.C.C. § 9–304(a) provides that "a security interest in money or instruments ... can be perfected only by the secured party's taking possession, except as provided in subsection (4) and (5) of this section...." Neither Paribas nor MBank had possession of the Note, so they cannot claim perfection pursuant to the above cited section.

Section 9.305 provides that:

> A security interest in letters of credit and advices of credit Subsection (b)(1) of Section 5.116, goods, instruments (other than certificated securities), money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. *If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the*

*bailee receives notification of the secured party's interest.* A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this chapter. The security interest may be otherwise perfected as provided in this chapter before or after the period of possession by the secured party.

(Emphasis added)

 Article 9 of the Uniform Commercial Code has no definition of a "bailee," therefore, pursuant to U.C.C. § 1–103 this Court will look to common law principles for the definition. Since the Court has classified the Note as an instrument, Illinois law would apply. Under Illinois law, "a bailment is the delivery of goods for some purpose, upon a contract, express or implied, that after the purpose has been fulfilled they shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept till he reclaims them." *Kirby v. Chicago City Bank and Trust Co.*, 82 Ill.App.3d 1113, 38 Ill.Dec. 489, 403 N.E.2d 720, 723 (1980) quoting *Knapp, Stout and Co. v. McCaffrey*, 178 Ill. 107, 52 N.E. 98 (1899), *aff'd* 177 U.S. 638, 20 S.Ct. 824, 44 L.Ed. 921 (1900). A bailment is a consensual relationship that can be established by express contract or implication. *Id.* An implied-in-fact bailment is determined by the surrounding facts such as benefits received by the parties, the parties intentions, the kind of property involved and the opportunity of each party to exercise control over the property. *Id.* Texas law is similar to the law of Illinois. See, e.g., *Berlow v. Sheraton Dallas Corp.*, 629 S.W.2d 818, 821 (Tex.App.—Dallas 1982 *Writ ref'd n.r.e.* ) ("In order to constitute a bailment there must be a contract, express or implied ..."); *Sanroc Co. Int'l v. Roadrunner Transportation, Inc.*, 596 S.W.2d 320, 322 (Tex.Civ.App.—Houston [1st Div.] 1980, no writ) ("A contract of bailment may arise by implication of law if through the proof of sufficient circumstances the implied rela-

tionship of bailor and bailee is shown to rest upon a substantive foundation.")

 Paribas asserts that its purported oral notification prior to bankruptcy and follow up telex after the bankruptcy was sufficient notification to First Chicago to make its interest perfected. Initially, there was no express agency agreement between First Chicago and Paribas. As to an implied bailment, Paribas has not produced enough evidence to support the establishment of this relationship. "A secured party depending for the perfection of its security interest upon the possession of a § 9–305 bailee must establish the existence of a bailment consistent therewith." *In re Kontaratos*, 10 B.R. 956, 968 (Bankr.D.Me. 1981). Paribas has failed to do so.

In the cases that held that a security interest was perfected in goods held by a bailee, the bailee was a third party who did not assert an interest in the bailed property. *In re National Buy-rite*, 11 B.R. 196, 198 (Bankr.Ga.1981). *See In re Miller*, 545 F.2d 916, 919 (5th Cir.), *cert. denied*, 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977) (A letter sent to the owner of an art gallery, the bailee of the paintings and sculptures which were the collateral, adequately served to notify the owner of the gallery of the secured party's interest in the collateral). See also *In re Copeland*, 531 F.2d 1195, 1204–05 (3rd Cir.1976) (Court found that an escrow agent for the benefit of both parties was a "bailee with notice" within the meaning of § 9–305 and that its possession therefore perfected security interest.). In our case, the bailee which Paribas alleges it notified of its interest is an interested stakeholder, namely the holder of a perfected security interest in the note. The reasoning for this distinction is clear although not expressly stated in the cases which address the point. By requiring the bailee to have no interest in the instrument in its possession, the danger of the bailee trying to pass the instrument off as his own is averted. The commercial world can rely upon an independent agent to represent accurately that the liens on the instrument do, in fact, exist. To re-

quire an interested party to inform the world of all other lien claimants, without an express agreement, would be a duty which the case law does not impose for the reason that the interested lienholder, who is also a bailee, would communicate conflicting signals to the commercial world for he would exercise unilateral control over the instrument while supposedly holding it for the benefit of another secured party. These are inconsistent positions that would cause chaos in commercial transactions.

Paribas has cited no cases which extend § 9–305 to the fact situation of a senior perfected security interest holder acting as bailee for a junior perfected security holder. Paribas relies heavily on *In re Chapman*, 5 U.C.C.R.S. 649 (W.D.Mich.1968), a case which held that "possession in one secured party should give notice of all secured interests known to the party having possession." *Id.* at 652–53. However that case is easily distinguishable on its facts. The junior lien holder was in possession of the security and the court reasoned that anyone who inquired of the junior lien holder would not only obtain information of Thomas' secured interest but also of the senior lienholder. This is because when the borrower assigned the note as security for the junior interest, he did so subject to the senior lien in an assignment agreement. *Id.* at 651. In our case, there was no such agreement. Coral did not give Paribas possession of the note subject to First Chicago's interest. Another case cited by Paribas, *In re Hurds*, is distinguishable from our case because that court held that a letter sent to the escrow holder was adequate to perfect the secured party's interest. 8 U.C.C.R.S. 3, 7 (Cal.Ct.App.1970). In our case, there was no such escrow holder.

Paribas' final argument on constructive possession is by analogy to U.C.C. § 9–305 and by construction of the U.C.C. to "permit the continued expansion of commercial transactions." This argument must be rejected for the following reasons. First Chicago testified at trial that it was standard banking procedure for the parties to an agency agreement to execute a formal written document. Paribas executed all of the necessary documents to perfect its security interest in the artwork and two stock pledges which were negotiated as the collateral for the 15 million dollar loan. Paribas did not execute an agency agreement or present any evidence that it had prepared a draft of an agency agreement to transmit to First Chicago. Paribas, as a major financial institution, must be charged with knowledge of the standard banking practice to establish a bailment relationship. Its inaction, coupled with its active role in perfecting its interest in other collateral, leads the court to the logical conclusion that Paribas did not believe that First Chicago was acting as its agent. In the case of *In re Winnett*, No. 76 Civ. 3810 (S.D.N.Y. August 14, 1979), *aff'd mem.*, 614 F.2d 1293 (2nd Cir.1979), the District Court held that there was no bailment relationship when the party with possession of the instrument "emphatically refused to act as (the) agent." In our case, this Court can not hold that First Chicago was Paribas' bailee without First Chicago having the opportunity to agree or to refuse to be Paribas' agent as to the Tricentrol Note. For this Court to so hold would be paramount to creating new law which this Court will properly leave to the legislative branch.

MBank raised the argument that since First Chicago was a party to the Inter Creditor-Agreement it had notice of all the other creditor's claim to the Tricentrol Note. This argument could be persuasive but insufficient evidence was produced to support this conclusion. The agreement, on its face, does not state explicitly or implicitly that any secured party who possesses an instrument acts as bailee or agent for all the other secured parties. The agreement deals with the priority between conflicting security interests which are *perfected* irrespective of the time and order of perfection, not the perfection of the security interest itself. In order to qualify as having a specific or general security interest under the Inter-Creditor Agreement, the creditor's security interest

must be perfected. There was no evidence produced that First Chicago, by becoming a party to the Inter-Creditor Agreement intended to act as bailee for Paribas or MBank thereby perfecting their respective interests pursuant to U.C.C. 9–305. For the forementioned reasons, Paribas does not have a perfected security interest in the Tricentrol Note because it lacked possession.

## WHETHER THE SIDE LETTER CREATES A SPECIFIC SECURITY AGREEMENT

The Court has ruled that neither Paribas nor MBank had perfected their security interest in the Tricentrol Note because each lacked possession and First Chicago does not qualify as a bailee under § 9–305. The Court does not have to reach the question of whether the side letter of January 27, 1983, signed by Mr. Sudhaus assigning payments from the Note grants a specific security interest to Paribas in the Note itself. However, the court has serious doubts as to whether this letter constitutes a security agreement to the note itself under the Uniform Commercial Code.

Under § 9–105(1)(*l*) a security agreement is an "agreement which creates or provides for a security interest." A "security interest" is defined as:

an interest in personal property or fixtures which secures payment or performance of an obligation....

The Fifth Circuit has stated that "there must be language in the instrument which leads to the logical conclusion that it was the intention of the parties that a security interest be created." *Sommers v. International Business Machines,* 640 F.2d 686, 689 (5th Cir.1981) quoting *Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 703 (10th Cir.1972); see also *Personal Jet, Inc., v. Callihan,* 624 F.2d 562, 567–68. (5th Cir.1980) (borrower which wrote letter contemporaneously with a loan of $250,000 stating that the loan would be secured by certain collateral was sufficient to grant a security interest to the bank). Other cir-

cuits which have ruled on the creation of a security agreement follow the Fifth Circuit's standard. See e.g., *Pontchartrain State Bank v. Poulson,* 684 F.2d 704, 705 (10th Cir.1982) (A promissory note and a letter sent from the creditor to the borrower, "by themselves or in combination" do not satisfy the requirements of creating a security agreement under Article 9); *Matter of Bollinger,* 614 F.2d 924, 928 (3rd Cir.1980) (Court should look at the "transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor, describing the collateral which demonstrates an intent to create a security interest in the collateral.") *In re Numeric Corp.,* 485 F.2d 1328, 1331 (1st Cir.1973) ("A writing, or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon, would satisfy both the formal requirements of the statute and the policies behind it.")

█ The side letter, on its face, does not sufficiently show that the proceeds of the Tricentrol Note were to be collateral for the 15 million dollar loan. Even though the courts have moved away from requiring a specific "grant" of a security interest, there is no language which leads this court to the logical conclusion that the Tricentrol Note was "collateral" for the loan. Once again, Paribas must be charged with knowledge of standard banking procedures. Paribas executed very specific security agreements as to the artwork; there is no reason for them not to have executed the same security agreement at the time as to the Tricentrol Note. This fact cannot be overcome by the evidence produced. Paribas argues the side letter was ambiguous and the court should look at parole evidence to resolve the ambiguity. This court will do so and finds that Banque Paribas Suisse specifically wrote a letter to Paribas in Paris which laid out the security in one section without including the Tricentrol Note.[6] The Tricentrol Note was listed under reimbursement, not security. There-

---

**6.** The letter to Paribas is reprinted in Appendix D.

fore, this Court concludes that Paribas itself did not believe it created a security agreement by the letter and is of the opinion that the side letter did not create a specific security agreement.

## DEBTOR–IN–POSSESSION'S AVOIDANCE POWER

Where no trustee or examiner has been appointed, the debtor-in-possession exercises all of the powers of a bankruptcy trustee. 11 U.S.C. § 1107. The debtor-in-possession has, as of the commencement of the case, the status of a hypothetical judicial lien creditor. 11 U.S.C. § 544(a). The rights of a judicial lien creditor are determined under state law. An "unperfected security interest is subordinate to the rights of ... (b) a person who becomes a lien creditor before the security interest is perfected." U.C.C. § 9–301(2)(b). A "lien creditor ... includes ... a trustee in bankruptcy from the date of the filing of the petition...." U.C.C. § 9–301(3). The Court finds that Paribas and MBank had unperfected security interests in the Tricentrol Note which can be avoided by the debtor-in-possession. Therefore, Coral Petroleum is entitled to the proceeds of the Tricentrol Note.

## CONCLUSION

Having determined that the Tricentrol Note is an instrument and the Banks did not hold a perfected security interest, either by possession or notice under U.C.C. § 9–305, this Court concludes that the debtor can avoid both Paribas' and MBank's interests pursuant to 11 U.S.C. § 544. Moreover, the side letter of January 27, 1983, does not establish a specific security interest in favor of Paribas in the Tricentrol Note. Accordingly, it is ORDERED that Paribas shall promptly remit to Coral the entire amount of the Tricentrol Note surplus, together with interest calculated at the highest rate which Paribas is currently charging to Coral, from the date Paribas received the funds to the date of disgorgement. In addition, the preference cause of action asserted in Coral's amended complaint is dismissed as being moot in light of the above decision.

## APPENDIX A

The body of the letter reads as follows:

Reference is made to the Loan Agreement dated as of January 27, 1983 (the "Loan Agreement") to be entered into between Banque Paribas (the "Bank") and Coral Petroleum, Inc., ("Coral") providing for a loan (the "Loan") to be made by the Bank to Coral in the sum of U.S. $15,000,-000.

In order to induce the Bank to enter into the Loan Agreement and make the Loan, Coral hereby agrees to remit to the Bank all payments received by Coral pursuant to two Promissory Notes (the "Tricentrol Notes"), dated September 17, 1982, in the principal amounts of U.S. $10,000,000 and U.S. $30,000,000, respectively, executed by Tricentrol Resources, Inc., payable to Coral Development, Inc. and assigned to Coral.

Amounts remitted to the Bank in respect of payments received by Coral pursuant to the Tricentrol Notes shall be applied by the Bank as follows: (i) initially, to the extent of U.S. $5,000,000, as a pre-payment of the Loan in the event that the Bank shall fail to receive from Coral the amount of the mandatory prepayment of the Loan in the event that the Bank shall fail to receive from Coral the amount of the mandatory prepayment required pursuant to Section 2.07(a) of the Loan Agreement; and (ii) thereafter, as a prepayment of the outstanding principal amount of the loan made by the Bank to Coral pursuant to the Term Loan Agreement dated as of August 30, 1982 between the Bank and Coral.

It is hereby agreed that the terms of this letter agreement shall not be amended, modified or waived without the prior written consent of the Bank.

## APPENDIX B

### INTER–CREDITOR AGREEMENT

RE: CORAL PETROLEUM. INC.,
 CORAL PETROLEUM (USA), INC.,
 VULCAN REFINING COMPANY,
 CORAL PETROLEUM SYRIA, INC.,
 KAKWA OIL & GAS, INC.

The subject (herein called the "Debtor") from time to time incurs obligations, direct and/or contingent, to each of the undersigned (herein called a "Creditor"), some or all of which obligations are secured, either wholly or partially, by Collateral. Each Creditor has filed or may file a financing statement under the Uniform Commercial Code and the Creditors desire to agree among themselves as to the relative priority of their respective security interests in Collateral. It is hereby agreed:

1. "Collateral" means all personal property and fixtures of the Debtor whether now or hereafter existing or now owned or hereafter acquired and wherever located, of every kind and description, tangible or intangible, including, but not limited to, all goods, documents, instruments, chattel paper, accounts, contract rights and general intangibles and including the products and proceeds thereof and accessions thereto, constituting security for obligations of the Debtor, direct or contingent.

2. "Specific Security Interest" means a perfected and enforceable security interest of a Creditor in any of the following Collateral, including the products and proceeds thereof and accessions thereto:

(a) Collateral in the possession of the Creditor (or an agent of bailee on its behalf); or

(b) Collateral made available to the Debtor by the Creditor (or its agent or bailee) pursuant to a trust receipt or other security agreement the effect of which is to continue the Creditor's security interest therein; or

(c) Collateral covered by a non-negotiable document issued in the name of the Creditor or as to which the Creditor (or an agent or bailee on its behalf) controls possession through a negotiable document; or

(d) Collateral which is an obligation owed by the Creditor to the Debtor; or

(e) Collateral which is specifically identified in a security agreement, or in another writing, delivered to the Creditor at or about the time the security interest attaches.

3. "General Security Interest" is any perfected and enforceable security interest of a Creditor in Collateral, however arising, other than a Specific Security Interest.

4. A Specific Security Interest of a Creditor in Collateral has priority to the extent of all obligations, direct or contingent, of the Debtor to such Creditor secured thereby over any General Security Interest of another Creditor in the same Collateral.

5. If Specific Security Interests of two or more Creditors attach to the same Collateral, the Specific Security Interest which is a purchase money security interest has priority over any other Specific Security, except that a Specific Security Interest of the type referred to in paragraph 2(c) hereof has, in the absence of notice of another security interest stamped on or affixed to the document (notwithstanding anything in paragraph 7 relating to notice), priority over any Specific Security Interest of the type referred to in paragraph 2(b), and Specific Security Interest of the type referred to in paragraph 2(b), and Specific Security Interests of two or more Creditors of the type referred to in paragraph 2(b) rank equally in priority.

6. The General Security Interest of each Creditor in Collateral ranks equally in priority with the General Security Interest of each other Creditor in the same Collateral.

7. The priorities specified herein are applicable irrespective of the time or order of attachment or perfection or security interests or the time or order of filing of financing statements or the giving or failure to give notice of the acquisition or expected acquisition of purchase money or other security interests.

8. Except as herein otherwise specifically provided, priority shall be determined in accordance with law.

9. This agreement shall terminate ten (10) days from the date on which one or more Creditors give written notice to each of the other Creditors of its intention to terminate. Termination shall not impair

any Specific or General Security Interest theretofore acquired by any Creditor or affect the priorities thereof hereunder.

10. This Agreement shall be governed by the laws of the State of New York. Unless the context otherwise requires, all terms used herein which are defined in the Uniform Commercial Code shall have meanings therein stated.

11. Any person who is not a party to this Agreement initially may become a party hereto by affixing his signature to the executed counterparts of this Agreement held by each Creditor. This Agreement is solely for the benefit of Creditors and their successors or assigns and no other person or persons shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

12. Each of the executed several counterparts of this Agreement shall be an original. All such counterparts shall together constitute one and the same instrument.

13. Anything above to the contrary notwithstanding, if the Collateral is a right to payment of the purchase price under an oil purchase contract covering the sale by Debtor of crude oil or other petroleum product which was acquired or will be acquired by that Debtor through drawings made under a letter of credit issued by a Creditor to enable that Debtor to acquire such crude oil or other petroleum product or drawings which that Creditor is subsequently obliged to pay under such letter of credit, for the account of that Debtor, the Specific Security Interest of the Creditor which issued such letter of credit under which such drawings were made or under which it will subsequently be obliged to pay such drawings shall have priority over any other Specific Security Interest in that Collateral to the extent of the indebtedness of that Debtor to that Creditor incurred as a result of drawings made or which that Creditor is subsequently obliged to pay under such letter of credit. If the priority of security interests in such Collateral cannot be determined as aforesaid and one or more of the Creditors has obtained from the purchaser under such oil purchase contract a written agreement of the purchase, specifically identifying such oil purchase contract, to pay the purchase price to that Creditor, the Specific Security Interest of the Creditor which first obtains such an agreement from the purchaser shall have priority over any other Specific Security Interest in the Collateral to the extent of the amount of the purchase price which the purchaser has agreed to pay to that Creditor.

IN WITNESS WHEREOF, each Creditor has caused this Agreement to be duly executed as of the 29th day of August, 1980....

## APPENDIX C

The telex contained the following information:

JUNE 2 1983

OSC/16:57

SRL 0344–06/03

TO: FIRST NATIONAL BANK OF CHICAGO

CHICAGO ILL

ATTN: JEFFERY A. FORBIS (sic)
 GREGORY B. BOYD

THIS WILL CONFIRM OUR CONVERSATION OF EARLY YESTERDAY AFTERNOON IN WHICH I INFORMED YOU THAT WE HAVE A SECURITY INTEREST IN FUNDS ARISING OUT OF A CERTAIN PROMISSORY NOTE IN THE AMOUNT OF DLRS 30 MILLION EXECUTED BY TRICENTROL RESOURCES INC. PAYABLE TO CORAL PETROLEUM DEVELOPMENT INC. SUBSEQUENTLY ASSIGNED TO CORAL PETROLEUM INC. AND PLEDGED TO YOU. OUR SECURITY INTEREST ATTACHS TO SURPLUS FUNDS DERIVED FROMSUCH (sic) NOTE OVER AND ABOVE YOUR OUTSTANDINGS. OUR SECURITY INTEREST AND OUR RIGHT TO THESE SURPLUS FUNDS ARISES BY VIRTUE OF VARIOUS SECURITY AGREEMENTS EXECUTED BY CORAL PETROLEUM INC. EXECUTED IN OUR FAVOR REGARDING THE APPLICA-

TION OF THE SURPLUS FUNDS. AC- CORDING TO SUCH SECURITY AGREE- MENTS AND SUCH UNDERTAKING THESE FUNDS MUST BE ULTIMATELY PAID TO US.

VERY TRULY YOURS,

RALPH J. AIELLO

VICE PRESIDENT AND GENERAL COUNSEL

BANQUE PARIBAS

NEW YORK

### APPENDIX D

WE UNDERSTAND THAT THE ABOVE MENTIONED LOAN HAS THE FOLLOWING TERMS AND CONDI- TIONS:

BORROWER: CORAL PETROLEUM INC., HOUSTON

AMOUNT: USDLRS 15,000,000.— (BOOKED AND FUNDED BY BY BANQUE PARIBAS NEW YORK, OF WHICH USDLRS 7,500,000.00 IS GUARANTEED BY BANQUE PARI- BAS (SUISSE) SA, GENEVA,

MATURITY: DEMAND NOTE

INTEREST RATE: CHASE FLOATING PRIME

SECURITY: —FIRST LIEN ON ST ELMO PROPERTY

:—FIRST LIEN ON ALL CANADIAN OIL AND GAS PROPERTIES

IMPRESSIONIST: —FIRST LIEN ON ORIENTALIST AND ART COLLEC- TION

:—FIRST LIEN ON MEXICAN VIL- LA

PURPOSE: THIS INTERIM FINANC- ING WILL BE USED FOR WORK- ING CAPITAL PURPOSES. CORAL AGREED TO MAINTAIN PAY- ABLES ON OPEN ACCOUNT TO SOME SUPPLIERS IN THE MINI- MUM LEVEL OF USDLRS—30,000,- 000.—IN ORDER TO AVOID ANY NEED FOR NEW WORKING CAPI- TAL FINANCING.

REIMBURSEMENT: —THE PRO- CEEDS OF THE SALE OR THE FI- NANCING OF THE TRICENTROL NOTE (APPROXIMATELY USDLRS 5,000,000.—)

—THE PROCEEDS OF ANY ASSETS PLEDGED TO BANQUE PARIBAS NEW YORK IN CONNECTION WITH THIS LOAN....