In re The **KELLY GROUP,
INC.,** Debtor.

**PANEL PUBLISHERS, INC.,** Plaintiff,

v.

**W. Alan SMITH, Jr.,** Trustee,
**Healthaction Group, Ltd.,**
Defendants.

Bankruptcy No. 91–02134.
Adv. No. 92–00168A.

United States Bankruptcy Court,
W.D. Virginia,
Charlottesville Division.

June 21, 1993.

---

W. Stephen Scott, Charlottesville, VA, for debtor.

**474**

John E. Falcone, Lynchburg, VA, for trustee.

William A. Forrest, Jr., Richmond, VA, for The Healthaction Group, Ltd.

## MEMORANDUM OPINION

WILLIAM E. ANDERSON, Chief Judge.

Before the court is an adversary proceeding in which Healthaction Group, Ltd. and W. Alan Smith, Jr., the chapter 7 bankruptcy trustee for The Kelly Group, Ltd., as interpleader defendants, claim funds which were deposited with this court on November 3, 1992 by Panel Publishers, Inc.

### FACTS

The debtor, The Kelly Group, Ltd. (Kelly Group), a publisher of specialty magazines, was a Delaware corporation with its principal place of business located in Charlottesville, Virginia. Joseph Kelly was its president and sole shareholder.

On August 1, 1990, First American Bank (First American) loaned Kelly Group $2,000,000.00 secured by a lien on Kelly Group assets. The loan and security interest were evidenced by a revolving credit line note and a security agreement both dated August 1, 1990. U.C.C. financing statements describing the security interest were filed with the State Corporation Commission of the Commonwealth of Virginia and with the Circuit Court of the City of Charlottesville, Virginia on August 10, 1990 and August 14, 1990, respectively.

By the summer of 1991, Kelly Group was experiencing an acute cash-flow problem and First American, its primary lender, was refusing to loan the company additional money. To raise cash, Kelly Group sold the newsletter "Medical Benefits" to Panel Publishers, Inc. (Panel) on September 12, 1991. Panel paid Kelly Group $2,056,430 [1] at the closing and signed a one-year, eight percent interest, $240,000.00 promissory note for the balance of the purchase price. The percentage of the purchase price repre-

sented by the note was withheld to ensure that Kelly Group's representations, including the circulation figures for "Medical Benefits," were accurate. The note, which was delivered to Joseph Kelly at the closing, is the subject of this proceeding.

When "Medical Benefits" was sold to Panel, Kelly Group owed First American approximately $2,500,000.00 and the assets securing that debt included the newsletter. First American was involved in the negotiations between Panel and Kelly Group and agreed to release its lien on "Medical Benefits" and related assets if Kelly Group paid it $500,000.00 from the proceeds of the sale. Kelly Group, Joseph Kelly and First American entered into a Master Loan Modification and Forbearance Agreement (the Forbearance Agreement), dated September 12, 1991, which provided for the refinancing of Kelly Group's indebtedness to First American. In accordance with Section 6 of the Forbearance Agreement, First American released its security interest in the Medical Benefits newsletter and related assets and Kelly Group executed an additional security agreement. First American filed another U.C.C. financing statement with the State Corporation Commission on September 18, 1991 and with the Circuit Court of the City of Charlottesville, Virginia on September 19, 1991.

Kelly Group subsequently defaulted under the Forbearance Agreement and, on November 12, 1991, filed a petition under chapter 7 of the Bankruptcy Code. Kelly Group, as the debtor, filed a list of its personal property with the Clerk of the Bankruptcy Court on December 16, 1991. The Panel note is listed on Schedule B as an unencumbered note receivable in the debtor's possession. Inconsistently, First American is listed on Schedule D as a secured creditor with its collateral described as "all right, title, and interest in and to all tangible and intangible assets and property of the debtor." Joseph Kelly signed the declaration attesting to the truthfulness

---

1. The stipulation of facts agreed to by the parties states that Panel paid Kelly Group $2,016,-430.00 instead of $2,056,430.00. The purchase agreement, however, indicates that a total of $2,056,430.00 was paid.

and accuracy of the Schedules for Kelly Group on December 13, 1991.

After filing the petition, Kelly Group's bankruptcy attorney took possession of the Panel note from the debtor and delivered it to the trustee who retained possession until the trial held in this proceeding. The attorney testified at the meeting of creditors held on January 2, 1992 that the note was an unencumbered asset of the bankruptcy estate. Joseph Kelly also testified at the section 341 meeting and did not contradict the attorney's testimony regarding the status of the Panel note.

Shortly after the section 341 meeting, the bankruptcy trustee notified Panel that he had possession of the note and expected to be paid when it became due. The trustee offered to discount the note for early payment but Panel did not agree to do so.

After the section 341 meeting, Joseph Kelly talked with the trustee about the possibility of purchasing certain Kelly Group assets and resuming business. Mr. Kelly did not mention the Panel note in his discussions with the trustee. Because First American had a lien on the assets inquired about, the trustee told Mr. Kelly that he would need to negotiate with First American and he subsequently did so. After preliminary discussions, Mr. Kelly made a $140,000.00 written offer to purchase the assets subject to First American's lien, which he described as "no longer hav[ing] any real value." First American accepted the offer by letter dated June 5, 1992. At about that time Mr. Kelly formed The Healthaction Group, Ltd. (Healthaction), a Virginia corporation of which he is the sole shareholder, director and officer, to purchase the assets. Mr. Kelly and First American apparently did not discuss the Panel note during their negotiations and the note is not mentioned in the correspondence between the parties.

To obtain approval to repossess and sell the assets in which it had a security interest, First American's counsel filed a Motion for Relief from the Automatic Stay. The motion describes the assets as "all equipment, fixtures, general intangibles, accounts, accounts receivable, contract rights, goods, inventory and the non-cash proceeds thereof." The Panel note is not referred to in the motion. A consent order granting the requested relief was entered on July 22, 1992.

On August 14, 1992, First American sold the assets in which it had a security interest to Healthaction for $100,000.00 in cash and a $40,000.00 promissory note. The source of the cash was a federal income tax refund which Joseph Kelly had received. As part of the transaction, First American released Mr. Kelly and his former wife from a possible $2,000,000.00 liability based on their personal guarantees of Kelly Group debts, and Mr. and Mrs. Kelly released First American from any claims, including lender liability claims, which they might have against First American. The Panel note is not specifically mentioned in any of the documents evidencing the sale of assets to Healthaction.

On September 1, 1992, the trustee notified Panel that $259,200.00 in principal and interest was coming due under the note. By letter dated September 2, 1992, Healthaction notified the trustee for the first time that it claimed the Panel note as part of the assets it had purchased from First American. The trustee responded that he believed the note was an asset of the bankruptcy estate and that he would not release it. Healthaction then notified Panel of its claim.

As a result of the competing claims, Panel instituted this interpleader action against the trustee and Healthaction on October 1, 1992. On November 3, 1992, Panel paid $262,097.36 representing the disputed funds to the Clerk of the Court. On December 22, 1992, an order was entered awarding Panel $3,296.50 of the disputed funds as attorney's fees and releasing it from this action.

The trustee and Healthaction litigated their respective claims to the Panel note proceeds at a trial held on March 15, 1992.

## CONTENTIONS of the PARTIES

Healthaction claims that First American had a security interest in the Panel note, that Healthaction purchased the note from

First American as part of the Kelly Group collateral, and that First American's security interest was properly perfected. The bankruptcy trustee argues that the note did not become part of the collateral in which First American held a security interest and that, even if the court were to find that the note was part of the collateral, First American did not properly perfect its security interest. The trustee also seeks its costs and attorney's fees from Healthaction.

## DISCUSSION

■ Each claimant in an interpleader action must establish its own claim by a preponderance ·of the evidence. 3A *Moore's Federal Practice* § 22.14(2), p. 22–128 (2d ed. 1993).

### A. Did First American have a security interest in the Panel note?

■ Healthaction bases its claim that First American had a security interest in the Panel note on the provisions of the September 12, 1991 security agreement entered into by Kelly Group after it sold "Medical Benefits" and restructured the First American loan. The security agreement does not specifically mention the note, but Healthaction argues that the general language included in it granting First American a security interest in all of Kelly Group's "tangible and intangible assets" covers it. The financing statements which were filed after the security agreement was entered into contain the same general language.

The trustee argues that neither First American nor Kelly Group intended to include the Panel note in the security interest conveyed after "Medical Benefits" was sold and that none of the loan modification agreements prepared at the time of the "Medical Benefits" sale refers to the note. He suggests that since First American was actively involved in Kelly Group's negotiations with Panel, if the parties had intended to give First American a security interest in the note they would have expressly provided for it in the documents.

The evidence at trial regarding the intent of the parties was not conclusive. Neither party called a representative of First American as a witness. Joseph Kelly and Judith Lewis, a former Kelly Group employee, testified that a representative of First American told them during the negotiations for the sale of "Medical Benefits" that First American considered the Panel note additional security. The schedule of assets which Mr. Kelly signed on behalf of Kelly Group and his failure to contradict the bankruptcy attorney's statement at the meeting of creditors that the note was not encumbered conflict with that testimony. Mr. Kelly ·also offered no explanation for why he did not inform the trustee that he believed First. American had a security interest in the Panel note until after he had acquired the rights to its proceeds for a substantial discount.

None of the documents evidencing the sale of "Medical Benefits" and the restructuring of Kelly Group's obligations to First American mention the Panel note. Neither do the correspondence and documents evidencing the sale of assets to Healthaction. The parties had no reason to believe that the note was not worth its full face amount and there was no evidence that First American or Mr. Kelly was ever concerned about payment.

When asked why First American would sell an asset worth approximately $260,-000.00, plus other Kelly Group assets with significant value, plus releasing Joseph Kelly and his former wife from approximately $2,000,000.00 in liability under the personal guaranties they had signed, all for just $140,000.00, Mr. Kelly could only point to the fact that he had contemporaneously released First American from unspecified and unfiled lender liability claims. The trustee testified, however, that he had found such claims completely meritless and had refused to pursue them on behalf of Kelly Group.

Given the absence of unequivocal evidence of intent, the lack of a specific reference to the Panel note in the Forbearance Agreement or in the security agreement which Kelly Group executed at the time of

the "Medical Benefits" sale strongly indicates that the note was not intended to be collateral. Furthermore, the express terms of the U.C.C. Statement of Partial Release of Collateral executed by First American and filed on September 16, 1991, released any security interest that First American might otherwise have had in the Panel note. The Partial Release provides as follows:

> The Secured Party releases from the security interest evidenced by the original Financing Statement all of the Debtor's assets related to the newsletter bearing the name "Medical Benefits" all as more particularly described on Exhibit A attached hereto. All other assets of the Debtor described in the original Financing Statement remain subject to the Secured Party's security interest.

Exhibit A to the Release consists of a three page list describing the assets released. Paragraphs (a) and (e), in part, provide:

> (a) The newsletter entitled "Medical Benefits" (the "Newsletter") and the right to prepare, publish, distribute, circulate and sell the Newsletter without restriction;

> (e) All right, title and interest in and to any and all properties, rights, and privileges related to or used or intended for use in connection with the preparation, publication, sale, distribution or circulation of the Newsletter, ...

**2.** Section 2.1 provides in part as follows:

Section 2.1 *Grant of Security Interest.* The GRANTOR hereby assigns to the BANK all of the GRANTOR'S right, title, and interest in and to, and grants to the BANK a continuing security interest in and to, all of the tangible and intangible assets owned by the GRANTOR, wherever located, whether now owned or hereafter acquired by the GRANTOR, together with all substitutions therefore, and all replacements and renewals thereof, and all accessions, additions, replacement parts, manuals, warranties and packaging relating thereto, including but not limited to the following tangible and intangible assets and property rights of the GRANTOR:

(c) GENERAL INTANGIBLES, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER, CONTRACT RIGHTS, contracts with CUSTOMERS, deposits and prepayments;

(n) The following publications:

(i) Health Resources;

Read literally, the Panel note was "related to" "Medical Benefits" and therefore paragraph (e) released any interest First American may have had in the Panel note.

As set forth below in Part B of this opinion, the court believes that the Panel note was an "instrument," not a "general intangible," for purposes of Article 9 of the Uniform Commercial Code. However, if the note could or should be considered a "general intangible," the concluding paragraph of Section 2.1 of the September 12, 1991 security agreement[2] specifically excludes general intangibles related to the "Medical Benefits" newsletter from the assets of Kelly Group in which First American was granted a security interest.

For the foregoing reasons the court concludes that First American did not hold a security interest in the Panel note and therefore could not have conveyed the note to Healthaction.

### B. How could a security interest in the Panel note have been perfected?

The trustee argues that even if the Panel note was part of the Kelly Group assets in which First American claimed a security interest, First American failed to perfect that security interest. This court agrees.

■ Applicable provisions of the Uniform Commercial Code determine whether First American had a perfected lien in the Panel note.[3] The trustee contends that the

(ii) Health Action Managers;

(iii) Pinnacle; and

(iv) Health Action; and

Notwithstanding anything contained herein to the contrary, the GRANTOR is not granting and the LENDER is not obtaining a security interest in the GRANTOR'S GENERAL INTANGIBLES relating to any publication except for those specific publications referred to in subsection 2.1(n) above....

**3.** The Master Loan Modification and Forbearance Agreement and the Security Agreements entered into by First American and Kelly Group, and the Purchase Agreement between Healthaction and First American, all contain choice of law provisions making Virginia law applicable, and both parties to this action agree that the Uniform Commercial Code as enacted in Virginia should apply.

note is an instrument as defined in Va.Code § 8.9–105(1)(i) [4], while Healthaction asserts that it is a general intangible as defined in Va.Code § 8.9–106.[5] Pursuant to Va.Code § 8.9–304(1) [6], if the note is classified as an instrument, a security interest in it could only be perfected by possession, while if it is a general intangible, a security interest was perfected by the filing of a financing statement pursuant to Va.Code §§ 8.9–302(1).[7]

■ Ordinarily, a promissory note would fall within the definition of instrument set forth in Va.Code § 8.9–105(1)(i), as either "a negotiable instrument as defined in § 8.3–104" or as

"any other writing which evidences a right to the payment of money and which is not itself a security agreement or lease and is of a type which is in the ordinary course of business transferred by delivery with any necessary indorsement or assignment." [8]

The Panel note is not a negotiable instrument because it is not payable to bearer and because it is subject to the terms of the Purchase Agreement between Kelly Group and Panel.[9] Because the note provides that it is not assignable nor negotiable by Kelly Group, Healthaction argues that it would not be transferrable by delivery and assignment, and therefore not fall within any part of the definition of instrument.

The note, however, does not clearly fall within the U.C.C. definition of general intangibles either. Although that definition is arguably broad enough to include a non-assignable promissory note, the Official Comment set forth in Va.Code § 8.9–106 makes clear that it was intended to cover

4. **§ 8.9–105. Definitions and index of definitions.**—(1) In this title unless the context otherwise requires:

   (i) *"Instrument"* means a negotiable instrument as defined in § 8.3–104, or a certificated security as defined in § 8.8–102 or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment; ...

5. **§ 8.9–106. Definitions: "Account"; "general intangibles."**—"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money.

6. **§ 8.9–304. Perfection of security interest in instruments, documents, and goods covered by documents; perfection by permissive filing; temporary perfection without filing or transfer of possession.**—(1) A security interest in chattel paper or negotiable documents may be perfected by filing. A security interest in money or instruments, other than certificated securities or instruments which constitute part of chattel paper, can be perfected only by the secured party's taking possession, except as provided in subsections (4) and (5) of this section and subsections (2) and (3) of § 8.9–306 on proceeds.

   (Neither the trustee nor Healthaction argues that any of the named exceptions to § 8.9–304(1) is applicable.)

7. **§ 8.9–302. When filing is required to perfect security interest; security interests to which filing provisions of this title do not apply.**—(1) A financing statement shall be filed to perfect all security interests except the following:

   (a) a security interest in collateral in possession of the secured party under § 8.9–305;
   ...

\*     \*     \*     \*     \*     \*

**§ 8.9–305. When possession by secured party perfects security interest without filing.**—A security interest in letters of credit and advices of credit as provided in paragraph (a) of subsection (2) of § 8.5–116, goods, instruments (other than certificated securities), money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral.

8. *See* complete text of Va.Code § 8.9–105(1)(i) at footnote 4, *supra.* Neither party to this action argues that the Panel note is a "certificated security."

9. *See* Va.Code § 8.3–104(1) which defines negotiable instrument as a writing which must:

   (a) be signed by the maker or drawer; and
   (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this title; and
   (c) be payable on demand or at a definite time; and
   (d) be payable to order or to bearer.

types of personal property such as goodwill, copyrights and trademarks that are not usually represented by a particular document.[10]

Although there are cases in which assignable but nonnegotiable promissory notes have been found to be instruments [11], few cases address whether a nonnegotiable and nonassignable promissory note is an instrument for purposes of U.C.C. Article 9. In support of his position, the trustee primarily relies on *In re Coral Petroleum, Inc.*[12], in which the court held that a nonnegotiable promissory note that contained language limiting its assignability except as security for a loan (but which had nevertheless been transferred contrary to that provision) was an instrument because it was "of a type which is in ordinary course of business transferred by delivery."[13] The *Coral Petroleum* court held that the quoted phrase from the definition of instrument should be interpreted broadly, and found that in order to transfer an interest in the note in question "a professional would deliver the writing with the necessary endorsements and assignments."[14]

Relying on *Coral Petroleum*, the trustee argues that the provision in the Panel note making it nonassignable by Kelly Group should not be determinative for purposes of determining whether or not the note is an instrument as defined in Va.Code § 8.9–105(1)(i). In the trustee's view, the language in the note making it nonassignable might affect the value of the note to the transferee, but not the ability of Kelly Group or some subsequent holder to transfer and deliver it.

Healthaction concedes that some nonnegotiable notes may be instruments, but argues, citing *Union Investment, Inc. v. Midland–Guardian Co.*, 30 Ohio App.3d 59, 506 N.E.2d 271, 3 UCC Rep.Serv.2d 1225 (1986)[15], that a nonnegotiable note that is also by its terms made nonassignable is not an instrument. While the court in *Union Investment* does treat a nonnegotiable, nontransferable promissory note as

---

**10.** Official Comment to Va.Code § 8.9–106 provides in part as follows:

> Purposes:
> The terms defined in this section round out the classification of intangibles: see the definitions of "document", "chattel paper" and "instrument" in Section 9–105. Those three terms cover the various categories of commercial paper which are either negotiable or to a greater or less extent dealt with as if negotiable. The term "account" covers most choses in action which may be the subject of commercial financing transactions but which are not evidenced by an indispensable writing. The term "general intangibles" brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance. Other examples are copyrights, trademarks and patents, except to the extent that they may be excluded by Section 9–104(a).

**11.** *See, e.g., In re Columbia Pacific Mrtg., Inc.*, 22 B.R. 753, 755 (Bankr.W.D.Wash.1982) and *Berkowitz v. Chavo Int'l, Inc.*, 74 N.Y.2d 144, 544 N.Y.S.2d 569, 542 N.E.2d 1086, 9 U.C.C.R.Serv.2d (Callaghan) 4, 7 (N.Y.1989).

**12.** 50 B.R. 830 (Bankr.S.D.Tex.1985).

**13.** In reaching its decision, the court cited and followed cases in which nonnegotiable certificates of deposit were found to be instruments. *See First National Bank in Grand Prairie v. Lone Star Life Insurance Co.*, 524 S.W.2d 525, 533 (Tex.Civ.App.—Dallas), *writ. ref'd n.r.e.*, 529 S.W.2d 67 (Tex.1975); *Citizens National Bank of Orlando v. Bornstein*, 374 So.2d 6, 10 (Fla.1979); *In re Kroh Brothers Development Co.*, 101 B.R. 114, 119 (Bankr.W.D.Mo.1989) and cases cited therein. The court also cited *General Electric Co. v. M & C Manufacturing, Inc.*, 283 Ark. 110, 671 S.W.2d 189, 190 (1984), which is apparently the only certificate of deposit case which expressly holds that a certificate of deposit that is both nonnegotiable and nonassignable is an instrument.

**14.** *Id.* 50 B.R. at 838. The court cited with approval Harris, "Non-negotiable Certificates of Deposits: An Article 9 Problem," 29 *U.C.L.A. L.Rev.* 330, 372 (1981) (the test to determine whether a writing is transferable in the ordinary course of business turns on what professionals ordinarily would do to transfer an interest in the claim evidenced by the writing in question).

**15.** Healthaction also cites cases holding that nonnegotiable, nontransferable certificates of deposit are not instruments in support of treating the Panel note as a general intangible. *See Bank IV Topeka v. Topeka Bank & Trust Co.*, 15 Kan.App.2d 341, 807 P.2d 686, 14 UCC Rep. Serv.2d 1222, 1225 (1991) and *Prudential–Bache Securities, Inc. v. Bartow County Bank*, 187 Ga.

a general intangible, it gives only a cursory explanation for doing so.[16]

Healthaction argues that because the Panel note stated that it was not assignable it could not be of a type which is ordinarily transferred. This argument overlooks the fact while the Panel note states that it was not assignable, it could of course have been assigned. And if Healthaction were correct that Kelly Group granted First American a security interest in the note, that act in fact constituted an assignment.[17]

In its brief, Healthaction cites a provision form Bender's Uniform Commercial Code Service in which the authors state that a case which holds that a nonnegotiable, nontransferable certificate of deposit is an instrument is difficult to reconcile with the literal language "of a type which is in ordinary course of business transferred by delivery with any necessary endorsement or assignment" in the U.C.C. definition of instrument. A few paragraphs further on, however, the following comments about certificates of deposit appear which this court finds are equally applicable to nonnegotiable, nontransferable promissory notes:

> But characterizing a [promissory note] as a general intangible is likely to be surprising, even when the [note] is nonnegotiable and nontransferable. Most commercial lawyers and secured lenders would expect to perfect a security interest in a [promissory note] by taking possession. To the extent that commercial law ought to coincide with commercial practice, requiring a secured party to file a financing statement to perfect this in-

terest in a [promissory note] will defeat the party's expectations. It also could be misleading for subsequent lenders. A later secured party might mistakenly rely on the debtor's possession of the [note] as an indication of a lack of encumbrances. Moreover, filing a financing statement is not likely to put subsequent parties on notice of a competing security interest, since few parties will likely consult the filing system where the collateral in question is a [promissory note]. Section 9–105(1)(i) might be construed to include nontransferable [promissory notes] as Article 9 instruments by treating such writings as within the "type" of writings (namely, [promissory notes]) that usually are transferable by means of delivery and indorsement. Characterizing nontransferable certificates of deposit as a subset of the larger class of Article 9 instruments which are "transferred, in ordinary course of business by delivery with any necessary indorsement or assignment" would then more closely conform with commercial expectations.

*See* Coogan, Hogan, Vagts & McDonnell, "Secured Transactions Under the Uniform Commercial Code," 1A *Bender's Uniform Commercial Code Service* § 6A.05[2][b], at pp. 6A–98, –99 (1993).

■ This court agrees with and adopts the reasoning of the quoted passage. Although acknowledging that the applicable provisions of the Uniform Commercial Code are somewhat unclear, this court holds that a nonnegotiable promissory

---

App. 530, 370 S.E.2d 751, 7 UCC Rep.Serv.2d 890, 891 (1988).

**16.** The court's reasoning for doing so is set out in footnote 2 of the opinion which states in its entirety as follows:

> FN. 2. Under the condition of the record on appeal, we must take this $10,000 note at face value. It is due in thirty-two days with interest in the amount of $107.82 (12.129%), and it appears to be nonnegotiable and nontransferable. There is nothing in the record to show that the note was an "account" under (UCC § 9–106), "chattel paper" under (UCC § 9–105(1)(b)), a "document" under (UCC § 9–105(1)(f)), or an "instrument" under (UCC § 9–105(1)(i)). Without a detailed explanation of our reasons, we

find that the note does not fall within any of the definitions found in those cited sections. We conclude, therefore, that it is a "general intangible" under (UCC § 9–106).

**17.** Interestingly, each of the "nonassignable" instruments at issue in the cases cited by Healthaction in support of finding that a security interest in the Panel note could not be perfected by possession was also in fact assigned. *See, e.g., Bank IV Topeka v. Topeka Bank & Trust Co., supra,* at 807 P.2d 686, 14 UCC Rep. Serv.2d 1222, 1223–24; *Union Investment, Inc. v. Midland–Guardian Co., supra,* at 506 N.E.2d 271, 3 UCC Rep.Serv.2d 1225, 1226; and *Prudential–Bache Securities, Inc. v. Bartow County Bank, supra,* at 187 Ga.App. 530, 370 S.E.2d 751, 7 UCC Rep.Serv.2d 890 (1988).

note, even one that by its terms is not assignable, is an instrument for purposes of Va.Code § 8.9–105(1)(i). The test for whether an instrument is within subsection 8.9–105(1)(i)'s coverage is whether the item is of a *type* which is ordinarily transferred by delivery with a necessary indorsement or assignment. *See* Hawkland, Lord & Lewis *UCC Series* § 9–105:10, p. 180 (Art. 9) (1993). It is common commercial practice to transfer promissory notes by delivery. "Businessmen and bankers are accustomed to dealing with these pieces of paper without referring to a filing system. And instruments such a promissory notes have long been treated as the complete embodiment of the underlying right." White & Summers, 2 *Uniform Commercial Code* § 24–12, p. 349 (3d ed.)

█ Therefore, if First American were to be found to have a security interest in the Panel note (and this court does not believe that to be the case) it was not perfected because as an "instrument" under Va.Code § 8.9–105(1)(i), a security interest in the note could only be perfected by possession pursuant to Va.Code § 8.9–304(1).

*C. Should the trustee's costs and attorney's fees be assessed against Healthaction as the losing claimant?*

The trustee has requested that the costs and attorney's fees he has incurred in this interpleader action be assessed against Healthaction because Healthaction's claim to the proceeds of the Panel note was not made in good faith. In his view the timing of the claim and the fact that Healthaction sought and obtained permission to amend a previously filed response to the trustee's request for admissions evidenced bad faith

and constituted abusive and unreasonable conduct.

Healthaction asserts its good faith and requests that a hearing be held on the trustee's request.

█ On December 22, 1992, this court entered a consent order which authorized Panel, as the stakeholder, to be paid $3,296.50 as its costs and attorney's fees from the note proceeds which had been previously deposited with this court. Allowing the costs and fees of a disinterested stakeholder to be paid from the disputed fund is within the discretion of the court and consistent with interpleader precedent.[18]

█ A court also has the discretion to order the losing claimant in an interpleader action to bear the winning claimant's costs and attorney's fees.[19] This court believes, however, that such an award should be limited to cases in which the losing claimant is clearly guilty of bad faith or misconduct with respect to the interpleader action. The conduct of Healthaction and Joseph Kelly in this case could not be so categorized. While it is unclear why Mr. Kelly did not initially inform the trustee that First American had a security interest in the Panel note if he thought that it did, the trustee did not establish that his failure to do so was intended to mislead. Once raised, the security interest question was not frivolous and the manner in which Healthaction and its attorney has conducted its defense is unobjectionable. The court will therefore not order Healthaction to pay the costs and attorney's fees incurred by the trustee in this interpleader action.

---

18. *See* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1719, at p. 629–30 (West 1986) ("A federal court has discretion to award costs and counsel fees to a stakeholder in an interpleader action, ..., whenever it is fair and equitable to do so.")

19. "The court's discretion also extends to the allocation of costs and attorney's fees incurred in adjudicating the dispute between the claim-

ants. In the normal case, these will be taxed against the losing claimant...." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1719, at p. 644 (West 1986). *See also*, 3A *Moore's Federal Practice* (2d ed.) § 22.16(2) at p. 22–181 ("Thus once the stakeholder is discharged, the costs of the contest between the claimants at the second stage will commonly be borne by the losing party there.")

## CONCLUSION

For the foregoing reasons this court will enter an order directing the Clerk of the Bankruptcy Court to pay W. Alan Smith, Jr., as Bankruptcy Trustee for The Kelly Group, Ltd., the balance of the funds deposited with the court in this proceeding by Panel Publishers, Inc.