490 S.E.2d 334

**The CADLE COMPANY, an Ohio Corporation, Plaintiff Below, Appellant,**

v.

**CITIZENS NATIONAL BANK, a Corporation, Defendant Below, Appellee.**

**No. 23539.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 5, 1997.

Decided July 3, 1997.

Thomas H. Fluharty, Clarksburg, for Appellant.

Matthew H. Fair, Elkins, for Appellee.

## PER CURIAM:

This appeal was brought by plaintiff/appellant, The Cadle Company (hereinafter "Cadle"), from a final judgment order of the Circuit Court of Randolph County, which found that the defendant/appellee, Citizens National Bank (hereinafter "CNB"), was not obligated to turn over the proceeds of a $10,000.00 Certificate of Deposit to Cadle. The case was tried before the circuit court

without a jury. In this appeal Cadle contends that the circuit court committed error in finding that it was not entitled to the proceeds of the CD. We disagree and affirm.

## I.

### FACTS

This action arose out of a financial transaction between Carl Nestor (hereinafter "Nestor") and the Tucker County Bank (hereinafter "TCB"), neither of whom are parties to the instant action. On January 1, 1983, Nestor obtained a $36,000.00 loan from TCB. As part of the collateral for the loan, Nestor assigned a $10,000.00 Certificate of Deposit (hereinafter "CD") to TCB.[1]

In February of 1984, TCB went into receivership and the Federal Deposit Insurance Company (hereinafter "FDIC") was appointed as its receiver. On February 4, 1984, CNB entered into an agreement with FDIC to purchase certain loans and deposit accounts that were owned by TCB. Among the items purchased by CNB was Nestor's assigned CD.[2] The CD file contained only a copy of the CD. Nothing appeared on the CD or in the CD file which made any reference to Nestor's loan and assignment of the CD as collateral. CNB was not informed by FDIC that the CD was impaired by an assignment for Nestor's loan.

In July of 1985, Nestor informed CNB that he had lost his copy of the CD and that he wanted to cash in the CD.[3] Nestor did not inform CNB that the CD was assigned as collateral on a loan. CNB required Nestor to sign an Indemnification Bond for Lost Documents. CNB thereafter paid to Nestor the value of the CD.[4]

On September 15, 1987, Cadle purchased, among other items, Nester's loan file from

FDIC. The loan file contained the original copy of the CD and the documents assigning the CD as collateral for the loan. At some point in 1988 Cadle contacted CNB requesting payout of the CD.[5] CNB informed Cadle that the CD had been retired and paid to Nestor. On November 14, 1990, Cadle filed the instant suit against CNB seeking recovery of the face value of the CD, plus accrued interest. After a bench trial,[6] the circuit court entered an order dated April 25, 1995, wherein it made findings of fact and conclusions of law. The circuit court found CNB was not liable to Cadle for payment of the CD. It is from this order that Cadle now appeals.

## II.

### STANDARD OF REVIEW

In syllabus point 1 of *Public Citizen, Inc. v. First National Bank in Fairmont,* 198 W.Va. 329, 480 S.E.2d 538 (1996) we set out the standard of review applicable to the instant proceeding as follows:

In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a de novo review.

We also noted in syllabus point 1 of *Brown v. Gobble,* 196 W.Va. 559, 474 S.E.2d 489 (1996) that:

The deference accorded to a circuit court sitting as factfinder may evaporate if upon review of its findings the appellate court

---

1. The CD started out as No. 1583. However, on February 1, 1983 the CD matured and was rolled over and replaced by CD No. 2293. The new number for the CD did not alter its assignment to TCB as collateral for Nestor's loan.

2. CNB did not purchase Nestor's 1983 loan. Consequently, Nestor's loan file was never reviewed by CNB.

3. It is not clear from the record how Nestor learned that CNB purchased the CD from FDIC.

4. The CD actually matured on August 1, 1985.

5. The record indicates Nestor defaulted on the loan and filed bankruptcy. It is not clear from the record how Cadle learned that CNB purchased the CD from FDIC.

6. Only two witnesses were called at the trial. Cadle called its owner, Cecil C. Cadle. CNB called its president, Robert James Schoonover.

determines that: (1) a relevant factor that should have been given significant weight is not considered; (2) all proper factors, and no improper factors, are considered, but the circuit court in weighing those factors commits an error of judgment; or (3) the circuit court failed to exercise any discretion at all in issuing its decision.

## III.

## DISCUSSION

■ We believe the circuit court reached the correct result in this case, but for the wrong reasons. We agree with the court in *Bank IV Topeka v. Topeka Bank & Trust Co.*, 15 Kan.App.2d 341, 343, 807 P.2d 686, 688 (1991) that " 'where the trial court reaches the correct result based upon the wrong reason, this [C]ourt will affirm the trial court.' " Quoting, *State v. Shehan*, 242 Kan. 127, 131, 744 P.2d 824 (1987). The circuit court applied general common law contract principles to reach its ultimate conclusion. However, the disposition of this case is governed by statute. We present the statutory analysis in two parts: (1) the role of FDIC and (2) application of the Uniform Commercial Code.

### A.

### The Role Of FDIC

In February of 1984, TCB went into receivership. Pursuant to W.Va.Code § 31A–7–4(a) (1981) the State banking commissioner is authorized to appoint a receiver for any financial institution that is insolvent or reasonably appears to be insolvent. W.Va.Code § 31A–7–4(b) specifically states that "if the involved financial institution has deposits insured by the Federal Deposit Insurance Corporation ... the commissioner shall appoint the Federal Deposit Insurance Corporation as receiver for the financial institution." W.Va.Code § 31A–7–5 (1981) sets out broad provisions governing FDIC as an appointed

receiver. Under W.Va.Code § 31A–7–5(b) FDIC is authorized to "immediately take full and exclusive *possession and control of and title to* the books, records papers, moneys, assets, business and all other things of the financial institution." (Emphasis added.)

■ Pursuant to W.Va.Code § 31A–7–5(b), FDIC not only had possession and control over the CD ultimately purchased by CNB, it had the title to the CD. W.Va.Code § 31A–7–4(a) provides that "[s]uch title shall pass to and vest in the receiver by operation of law without the execution of any instruments of conveyance, assignment, transfer or endorsement." [7]

■ By vesting title ownership to the CD in FDIC by operation of law, greater rights, duties and responsibilities were imposed upon FDIC in the manner in which it disposed of the CD. As title owner of the CD, FDIC had the exclusive responsibility for determining the degree to which the CD was impaired. In other words, when CNB approached FDIC regarding the purchase of the CD, FDIC had the legal duty to explicitly inform CNB that the CD was impaired by an assignment as collateral for a loan.[8] The evidence at trial established that FDIC did not inform CNB that the CD was impaired.

### B.

### Application Of The Uniform Commercial Code

■ In reaching the conclusion that CNB was not liable to Cadle for payment of the CD, the circuit court analyzed the evidence in this case under general common law contract principles. We believe that it was improper for the circuit court to apply general common law contract principles to resolve this case. The applicable controlling law is the Uniform Commercial Code ("UCC"), as

---

**7.** This Court previously held in syllabus point 4 of *United States Fidelity & Guaranty Co. v. Central Trust Co.*, 95 W.Va. 458, 121 S.E. 430 (1924), that "[t]itle to the property of an insolvent bank does not pass to a receiver appointed by the commissioner of banking[.]"

**8.** At the point in time in which CNB approached FDIC about purchasing the CD, FDIC was in fact title owner of the loan which impaired the CD.

adopted in Chapter 46 of the West Virginia Code.[9]

It is clearly stated in W.Va.Code § 46–9–102(1)(a) (1974) that Article 9 of the UCC applies "to any transaction (regardless of its form) which is intended to create a security interest in ... instruments[.]"[10] The definition of instrument contained in W.Va.Code § 46–9–105(1)(i) (1979)[11] provides that:

> " 'Instrument' means a negotiable instrument ..., or a certificated security ... or *any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary endorsement or assignment* [.]" (Emphasis added.)

▪ It is clear from the record that the CD was not a negotiable instrument[12] or certificated security.[13] Therefore, for the CD to be considered an instrument for Article 9 purposes, it must come under the element *"any other writing."* A review of other jurisdictions that have addressed this issue indicates that the majority have concluded that a CD of this type falls under the element *"any other writing "* of Article 9. *See First National Bank in Grand Prairie v. Lone Star Life Insurance,* 524 S.W.2d 525 (Tex.Civ.App.1975); *Old Southern Life Insurance Co. v. Bank of North Carolina,* 36 N.C.App. 18, 244 S.E.2d 264 (1978); *Citizens National Bank of Orlando v. Bornstein,* 374 So.2d 6 (Fla.1979); *Wightman v. American National Bank of Riverton,* 610 P.2d 1001 (Wyo.1980); *Franke v. Third National Bank & Trust Co.,* 31 Ohio App.3d 189, 509 N.E.2d 955 (1986); *Republican Valley Bank v. Security State Bank,* 229 Neb. 339, 426 N.W.2d 529 (1988); *Craft Products, Inc. v. Hartford Fire Insurance Co.,* 670 N.E.2d 959 (Ind.Ct. App.1996).[14] "We agree with the weight of authority in holding that a certificate of deposit is an 'instrument,' " under Article 9 of the UCC. *General Electric Co. v. M & C Manufacturing, Inc.,* 283 Ark. 110, 111, 671 S.W.2d 189, 190 (1984).[15] The fact that the

**9.** The legislature enacted numerous amendments to the UCC since the dates of the relevant transactions in this case. Consequently, references will be made to applicable UCC provisions that were in effect during the relevant transaction periods in this case. *See* Syl. Pt. 3, *Shanholtz v. Monongahela Power Co.,* 165 W.Va. 305, 270 S.E.2d 178 (1980).

**10.** The term "security interest" is defined in W.Va.Code § 46–1–201(37) (1963), in relevant part, to mean "an interest in personal property ... which secures payment or performance of an obligation." This definition remained intact in spite of subsequent amendments to the statute. *See* W.Va.Code § 46–1–201(37) (Supp.1996).

**11.** For the 1996 amended version of the statute *see* note 15 *infra.*

**12.** W.Va.Code § 46–3–104(1) (1963) defines negotiable instrument to include a certificate of deposit. However, W.Va.Code § 46–3–104(3) permits a certificate of deposit to be non-negotiable. In the case at hand, the CD was marked non-negotiable. *See* note 16 *infra.* Additionally, the current amended version of the statute, found at W.Va.Code § 46–3–104 (1993), rewrote the statute in its entirety. The current statute does not contain a provision that explicitly permits a certificate of deposit to be non-negotiable.

**13.** W.Va.Code § 46–8–102(1)(a) (1979) defines "certificated security" as follows:
(a) A "certificated security" is a share, participation, or other interest in property of or an enterprise of the issuer or an obligation of the issuer which is
(i) represented by an instrument issued in bearer or registered form;
(ii) of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
(iii) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests, or obligations.
The above statute was rewritten in 1995. The provision in question is now found at W.Va.Code § 46–8–102(a)(4) (Supp.1996), and provides that a " '[c]ertificated security' means a security that is represented by a certificate." *See* W.Va.Code § 46–8–102(a)(15) (Supp.1996) for the definition of "security."

**14.** *But, see, Prudential–Bache Securities, Inc. v. Bartow County Bank,* 187 Ga.App. 530, 370 S.E.2d 751 (1988) (holding that a CD is not an Article 9 instrument); *Bank IV Topeka v. Topeka Bank & Trust Co.,* 15 Kan.App.2d 341, 807 P.2d 686 (1991) (holding that a CD is not an Article 9 instrument).

**15.** We do not hesitate in reaching the conclusion that the CD is an instrument for Article 9 purposes for two reasons. First, we believe the majority rule on this issue is sound and furthers the public policy concerns implicit in the UCC generally. Second, we note that the legislature amended the statute so that it currently explicitly holds that all CDs are an instrument for Article 9

CD in question was marked non-negotiable is not relevant in order to find that it is an instrument for Article 9 purposes.[16] "A non-negotiable CD is widely recognized as embodying the underlying property and as being transferable." *In re Latin Investment Corp.*, 156 B.R. 102, 108 (Bktcy.D.C.1993). *See In re Dawson*, 52 B.R. 444, 447 (Bktcy.N.D.Ala.1984) ( "A certificate of deposit is an 'instrument' under Article 9, whether it is negotiable or non-negotiable.") (citations omitted).

■ We now proceed to dispose of this case.[17] W.Va.Code § 46–9–308(a) (1974) provides in relevant part:

A purchaser of . . . an instrument who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest in the . . . instrument

(a) . . . if he acts without knowledge that the specific . . . instrument is subject to a security interest[.]

One of the purposes behind the above statute is to protect the buyer of an instrument from liability to a third party who holds a security interest in the instrument unbeknownst to the buyer. This point was made clear in

*Blazer Financial Services, Inc. v. Harbor Federal Savings & Loan Ass'n*, 623 So.2d 580 (Fla. 4th Dist.Ct.App.1993). In *Blazer Financial Services* the instrument in dispute was chattel paper. The defendant in that case purchased, among other items, chattel paper. At the time of the purchase the defendant did not have knowledge that a security interest in the chattel paper existed. The plaintiff held the security interest and filed suit to recover the value of the chattel paper. The appellate court rejected the plaintiff's claim to any portion of the chattel paper. In doing so, the appellate court interpreted the state of Florida's version of UCC Article 9, section 308 to mean that "one who purchases chattel paper in accord with the statutory requirements of section 679.308 has a priority interest in the chattel paper to the full extent of its face value." *Id.* 623 So.2d at 583. *See also Borg–Warner Acceptance Corp. v. Massey–Ferguson, Inc.*, 713 S.W.2d 351 (Tex.App.1985).

■ Applying W.Va.Code § 46–9–308(a) to the case at hand, we find the evidence established that CNB took possession of the CD for its value and in the ordinary course of its business.[18] The evidence also

---

purposes. W.Va.Code § 46–9–105(1)(i) (Supp. 1996) provides:

"Instrument" means a negotiable instrument (defined in section 3–104), or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary endorsement or assignment including, but not limited to *all certificated certificates of deposit*. The term does not include investment property[.] (Emphasis added.)

**16.** The record indicates that the face of the CD stated: "This instrument is nonnegotiable and assignable only on the books of the Bank and is a Time Certificate of Deposit subject to all applicable rules and regulations with respect thereto now or hereafter promulgated by this State, the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System or the Bank." Cadle contends that it was error for the circuit court to find that the CD was non-negotiable and non-assignable. The circuit court was correct in finding the CD was non-negotiable, because that is what was written on the face of the instrument.

The circuit court incorrectly found that the CD was non-assignable. The evidence clearly established that Nestor assigned the CD to TCB. "A

nonnegotiable instrument is assignable, like any other contract right, even though the assignee could never be a holder in due course." *Republican Valley Bank*, 229 Neb. at 343–44, 426 N.W.2d at 532 (citations omitted). The circuit court reached the conclusion of non-assignability based upon its erroneous determination that CNB had to give permission to Nestor to assign the CD to Cadle. Ultimately the error on this issue was harmless, because it is not relevant to the disposition of the case. The critical point here, which is discussed in the text of this opinion, is that CNB did not have knowledge of the prior assignment when it purchased the CD or when it paid the CD to Nestor.

**17.** Although we dispose of this case under W.Va. Code § 46–9–308(a), the principles of law and equity provided for in W.Va.Code § 46–1–103 (1963) are equally applicable in affirming the circuit court's final order. E.g., the doctrines of estoppel and misrepresentation as set out in the latter statute.

**18.** W.Va.Code § 46–1–201(9) (1963) defines the phrase "buyer in ordinary course of business," in relevant part, to mean "a person who in good faith and without knowledge that the sale to him is in violation of the . . . security interest of a

established that CNB had no knowledge that the CD was impaired by a security interest, at the time of purchase or when it paid the CD to Nestor. We are not moved by Cadle's argument that CNB was put on notice[19] of an impairment when Nestor presented himself to CNB claiming to have lost the CD. We observed in *Peters v. Peters*, 191 W.Va. 56, 443 S.E.2d 213 (1994) that "depositors often lose or mislay ... CDs." *Id.* 191 W.Va. at 60, 443 S.E.2d at 217. In recognizing this fact in *Peters*, we rejected the argument that banks should be required to employ probing procedures when customers request payment on lost instruments. We stated that "[i]f we accede to [the] argument, then banks will be required to put depositors to endless hassle when passbooks or CDs are lost or mislaid." *Id.* We are convinced that CNB had no knowledge that a security interest in the CD existed. Therefore, CNB acted properly in paying out the CD to Nestor.[20]

## IV.

### CONCLUSION

For the reasons set out herein the circuit court's final order is affirmed.

Affirmed.

---

third party[.]" *See* W.Va.Code § 46–1–201(9) (Supp.1996).

**19.** W.Va.Code § 46–1–201(25) (1963) defines notice as follows:

> (25) A person has "notice" of a fact when
> (a) he has actual knowledge of it; or
> (b) he has received a notice or notification of it; or
> (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exits.

*See* W.Va.Code § 46–1–201(25) (Supp.1996).

**20.** Cadle did not include the correct parties in this action. As title owner and possessor of the Nestor loan file, which contained the original CD, FDIC had a perfected security interest in the CD under W.Va.Code § 46–9–304(1) (1979). *See* W.Va.Code § 46–9–304(1) (Supp.1996). Additionally, under W.Va.Code § 46–9–306(2) (1974) "a security interest continues in collateral notwithstanding [its] exchange or other disposition ... *unless the disposition was authorized by the*

---

*secured party* [.]" (Emphasis added.) *See* W.Va. Code § 46–9–306(2) (Supp.1996). The import of W.Va.Code § 46–9–306(2) is examined from two perspectives.

First, the record indicates that CNB was not informed by FDIC of the security interest that existed in the CD. Therefore, when FDIC sold CNB the CD, it implicitly waived the security interest and authorized CNB to payout the CD to Nestor upon demand. *See Anon Inc. v. Farmers Production Credit Ass'n of Scottsburg*, 446 N.E.2d 656, 660 (Ind.App.1983) ("[C]ertain conduct ... may create a ... waiver of the security interest itself."). From this perspective, it is evident that Cadle should have included FDIC in this action.

Second, the record leads this Court to believe that Nestor was aware that the CD was impaired by his loan. Nothing in the record indicates that FDIC implicitly or explicitly authorized Nestor to solicit and obtain a payout from the CD. Therefore, under W.Va.Code § 46–9–306(2) Nestor's conduct did not extinguish the security interest in the CD as it pertained directly to him. From this perspective, it is evident that Cadle should have included Nestor in this action.