This Court has accepted for response the following certified question from C. Michael Stilson, bankruptcy judge of the United States Bankruptcy Court for the Northern District of Alabama, Western Division:
"I. STYLE OF THE CASE
 "The style of the case in which the certification is made is Robert A. Morgan, as Trustee vs. Farmers Merchants Bank, an adversary proceeding (AP 01-70013) filed in Crimson Industries, Inc.'s Chapter 7 bankruptcy case (BK 00-72372) which is pending before this Bankruptcy Court.
"II. STATEMENT OF THE FACTS
 "The facts in this case are undisputed. The following summation is based on the record:
 "Crimson Industries, Inc. (debtor), a former mobile home manufacturer of Bear Creek, Alabama, executed four promissory notes/security agreements granting to Farmers Merchants Bank (bank) of Waterloo, Alabama, security interest in documents captioned `Money Market Certificate (Non-negotiable).' The debtor also executed documents captioned `Assignment of Certificate of Deposit' which transferred and assigned to the bank the same certificates as security for the loans.
 "The debtor executed one loan agreement, a renewal of a prior indebtedness, May 9, 2000, pledging five certificates as collateral. Three of the certificates had been issued on October 22, 1990; one, on August 5, 1992; and one, on August 25, 1992. Each of these certificates, by their terms, [was] automatically renewable. A document styled Assignment of Certificate of Deposit listing these five certificates was signed by the debtor June 24, 1997. It provided a continuing assignment effective for any renewals of the loan.
 "Crimson Industries executed the second of these promissory note/security agreements May 28, 2000, pledging eight certificates issued from May 28, 1994 to July 22, 1995 as collateral. Each of these certificates was automatically renewable pursuant to [its] terms. The debtor executed a document captioned Assignment of Certificate of Deposit describing these certificates on June 24, 1997.
 "In late June 1997, Crimson Industries and the bank entered two security agreements whereby the debtor granted the bank a security interest in two certificates to collateralize payment of two letters of credit the bank had issued on behalf of the debtor. These security agreements pledged two certificates dated October 17, 1995 and September 11, 1996 respectively. On June 23, 1997, the debtor again executed a document captioned Assignment of Certificate of Deposit assigning these two certificates to the bank.
 "All documents captioned `Money Market Certificates (Non-negotiable)' which are in issue are identical in form to the attached Exhibit A. [Exhibit A is not attached to this opinion.] All documents captioned `Assignment of Certificate of Deposit' are identical in form to attached Exhibit B. [Exhibit B is not *Page 814 
attached to this opinion.] The security agreements executed by the debtor and bank were sufficient for the bank's security interest to attach to the various certificates.
 "The bank took possession of all of the certificates at the time of their assignment and has maintained sole possession since that time. Farmers 
Merchants' vice president testified that there was a dual hold on each of the certificates. In other words, neither the debtor nor the bank nor any other party could withdraw the funds represented by the certificates without the bank's permission. The bank took no other action to perfect its liens in the subject certificates.
 "The debtor filed a bankruptcy petition September 25, 2000. It is undisputed that the debtor was in default on obligations to the bank at that point. The bank asserts that its possession of the documents represented by Exhibit A and the funds they control is sufficient to perfect its security interest against intervening third-parties under Alabama law.
 "On the other hand, the debtor's bankruptcy trustee asserts that the bank did not perfect its security interest under Alabama law. His position is that the bank could not perfect a security interest by possession; and therefore, his right as an intervening third-party creditor as of September 25, 2000, is superior to the bank's unperfected security interest.
"III. QUESTION TO BE CERTIFIED
 "Whether, based on these facts, Farmers 
Merchants Bank's security interest in Crimson Industries, Inc.'s funds denoted by `Money Market Certificates (Non-negotiable)' as represented by Exhibit A and the accompanying assignments represented by Exhibit B, is perfected against the rights of intervening third parties under the law of Alabama?
 "The phrasing suggested in this certified question is intended as a guide and is not to restrict the Alabama Supreme Court's consideration of the issues in its analysis of the record certified in this case."
Pursuant to Judge Stilson's direction, the clerk of the bankruptcy court has transmitted to this Court the above-referenced "Exhibit A" and "Exhibit B."
Certified questions are controlled by Rule 18, Ala.R.App.P., which authorizes certification to this Court of "questions or propositions of law of this State which are determinative of [a] cause," and for which "there are no clear controlling precedents in the decisions" of this Court. Under Rule 18, our response is to be in the form of "instructions concerning such questions or propositions of state law."
We have granted the motion of the Alabama Bankers Association for leave to file a brief as amicus curiae; accordingly, we have before us the briefs not only of Robert A. Morgan, as trustee of the bankruptcy estate (hereinafter "the trustee"), and Farmers Merchants Bank (hereinafter "the bank") but also that of the Alabama Bankers Association (hereinafter "the association").
Our analysis of the issues presented by the certified question, against the backdrop of the transactions between the bank and Crimson Industries, Inc. (hereinafter "Crimson"), and in consideration of the standing, rights, and powers of the trustee, is governed by the applicable provisions of Alabama's version of the Uniform Commercial Code (hereinafter "the UCC"). We must interpret and apply the various provisions of article 3 of the UCC (§ 7-3-101 et seq., Code of Alabama 1975, *Page 815 
"Uniform Commercial Code — Negotiable Instruments") and Article 9 (§ 7-9-101 et seq., "Uniform Commercial Code — Secured Transactions"). Although article 9 as codified at § 7-9-101 was repealed by the Legislature in 2001, see Act No. 2001-481, Ala. Acts 2001, and superseded by "Article 9A" (§ 7-9A-101 et seq., "Uniform Commercial Code — Secured Transactions"), the new version did not become effective until January 1, 2002. Section 7-9A-702 expressly provides that "[t]his article does not affect an action, case, or proceeding commenced before January 1, 2002." The subject bankruptcy case having been commenced before that cutoff date, both the bank and the association expressly acknowledge that this case is controlled by §7-9-101 et seq., and the trustee implicitly agrees. Accordingly, all references to sections of article 9 in this opinion will relate to the version of that article previously codified at § 7-9-101.
It is undisputed that the trustee, pursuant to provisions of11 U.S.C. § 544, has the standing to challenge the bank's security interest in the certificates as unperfected. In § 544, the trustee is accorded a status whereby, if the security interest at issue was not perfected by possession, the bank's status as a creditor is reduced to that of a general unsecured creditor, thereby increasing the bankruptcy estate available to all creditors. As explained by the certified question, at issue are several "Money Market Certificates (Non-negotiable)," each of which is identical in all pertinent respects. Accordingly, for convenience we will refer to those certificates in the singular as "the certificate." The certificate certifies that there has been deposited with the bank a particular sum, payable to Crimson in current funds on a certain number of days after its date, on return of the certification "properly endorsed." The certificate earns interest to maturity at a stated rate. The reverse side advises the depositor of certain "information regarding your Time Deposit No. ____," relating to penalties for early withdrawal.
Likewise, the certified question advises that each "assignment of certificate of deposit" is identical in all pertinent respects, and we will refer to the same in the singular as "the assignment." The assignment declares that, for value received, Crimson "transfer[ed] and assign[ed] to [the bank] Certificate of Deposit # ____ as security for loan dated __________, in the amount of ____ and due ____." The assignment is declared to be a continuing one, effective for any renewals of the loan, and the bank was authorized to charge against the certificate any notes representing the unpaid balance of the loan at maturity, if not otherwise paid.
The whole or a portion of multiple sections of the UCC have possible application to our inquiry, and for ready reference, we set them out.
Ala. Code 1975, § 7-1-102(1) and (2):
 "§ 7-1-102. Purposes; rules of construction; variation by agreement.
 "(1) This title shall be liberally construed and applied to promote its underlying purposes and policies.
"(2) Underlying purposes and policies of this title are:
 "(a) To simplify, clarify and modernize the law governing commercial transactions;
 "(b) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
 "(c) To make uniform the law among the various jurisdictions."
Ala. Code 1975, § 7-1-201(37)a:
 "`Security interest' means an interest in personal property or fixtures which *Page 816 
secures payment or performance of an obligation. . . ."
Ala. Code 1975, § 7-3-102(b):
 "(b) If there is conflict between [Article 3] and Article 4 or 9, Articles 4 and 9 govern."
Ala. Code 1975, § 7-3-104(a), (b), (d), and (j):
 "(a) Except as provided in subsections (c) and (d), `negotiable instrument' means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
 "(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
 "(2) Is payable on demand or at a definite time; and
 "(3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.
"(b) `Instrument' means a negotiable instrument.
". . . .
 "(d) A promise or order other than a check is not an instrument if, at the time it is issued or first comes into possession of a holder, it contains a conspicuous statement, however expressed, to the effect that the promise or order is not negotiable or is not an instrument governed by this article.
". . . .
 "(j) `Certificate of deposit' means an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money. A certificate of deposit is a note of the bank."
Ala. Code 1975, § 7-3-201(a):
 "(a) `Negotiation' means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder."
Ala. Code 1975, § 7-3-203(a):
 "(a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."
Ala. Code 1975, § 7-9-102(1) and (2):
 "(1) Except as otherwise provided in Section 7-9-104 on excluded transactions, this article applies:
 "(a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts; and also
"(b) To any sale of accounts or chattel paper.
 "(2) This article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This article does not apply to statutory liens except as provided in Section 7-9-310."
Ala. Code 1975, § 7-9-104(l):
"This article does not apply:
". . . . *Page 817 
 "(l) To a transfer of an interest in any deposit account (subsection (1) of Section 7-9-105), except as provided with respect to proceeds (Section 7-9-306) and priorities in proceeds (Section 7-9-312). . . ."
Ala. Code 1975, § 7-9-105(1)(e) and (i):
" Definitions and index of definitions.
 "(1) In this article unless the context otherwise requires:
". . . .
 "(e) `Deposit account' means a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit;
". . . .
 "(i) `Instrument' means a negotiable instrument (defined in Section 7-3-104), or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment. The term does not include investment property. . . ."
Ala. Code 1975, § 7-9-302(1)(a):
 "(1) A financing statement must be filed to perfect all security interests except the following:
 "(a) A security interest in collateral in possession of the secured party under Section 7-9-305. . . ."
Ala. Code 1975, § 7-9-304(1):
 "(1) . . . A security interest in money or instruments (other than instruments which constitute part of chattel paper) can be perfected only by the secured party's taking possession, except as provided in subsections (4) and (5) of this section and subsections (2) and (3) of Section 7-9-306 on proceeds."
Ala. Code 1975, § 7-9-305 (effective January 1, 1998):
 "A security interest in goods, instruments, money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. A security interest in the right to proceeds of a written letter of credit may be perfected by the secured party's taking possession of the letter of credit. . . ."
There is no specific definition anywhere in the UCC for a "money-market certificate," but the Dictionary of Banking Terms (Thomas P. Fitch, ed., 4th ed. 2000) defines that term as follows:
 "Money Market Certificate (MMC) nonnegotiable certificate of deposit with a minimum denomination of $2,500 and an original maturity of at least seven days. Prior to January 1983, when the MMC was deregulated, the account was a six-month C.D. requiring an initial deposit of $10,000 to open an account, and paying a rate tied to the yield on six-month U.S. Treasury bills. With deregulation, maturities and rates paid depositors are set by management policy in individual financial institutions, not by government regulation."
As stated in the facts supplied with the certified question: "The bank took possession of all of the certificates at the time of their assignment and has maintained sole possession since that time." The threshold question presented, stated in functional terms, is whether the certificate represented an "instrument" under article 9, so that the security interest in it granted the bank by Crimson was perfected, pursuant to § 7-9-305, by the bank's taking possession of it. The trustee contends, and we agree, that the certificate cannot qualify as an "instrument" under *Page 818 
§ 7-3-104(b), because it is not payable to bearer or to order, as required by § 7-3-104(a)(1), and because it contains a conspicuous statement that it is not negotiable, as covered by § 7-3-104(d). We also agree with the trustee that the certificate cannot qualify as an article 3 "Certificate of Deposit," pursuant to § 7-3-104(j), because such a certificate must be an article 3 "instrument," which this certificate cannot be under the terms of § 7-3-104(b).
The trustee also contends that the certificate cannot qualify as an "instrument" under the definition provided by § 7-9-105(1)(i), whereby an "`Instrument' means a negotiable instrument (defined in Section 7-3-104), or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary endorsement or assignment. The term does not include investment property." (Emphasis supplied.)
This definition clearly embraces two separate concepts in the alternative, as manifested by the first use of the disjunctive "or" For ease of reference, we will refer to those concepts as the "negotiable-instrument" concept and the "other-writing" concept. The trustee argues that, despite the statement of these categories in the alternative, the other-writing concept is "complemented by" the provisions of § 7-3-104(d) that a written promise cannot be an instrument if it contains a conspicuous statement that it is not negotiable. In the view of the trustee, the other-writing alternative is "tempered by" and "limited by" § 7-3-104(d), to the extent that an other writing that is labeled as not negotiable cannot qualify as an instrument under § 7-9-105(1)(i). It is the trustee's position that the initial statement in 105(1)(i) that the word "instrument" means a negotiable instrument as defined in § 7-3-104 mandates application of the subsection 7-3-104(d) limitation across the board, so as to restrict and limit the alternative concept of "any other writing."
Caselaw and the positions taken by various commentators and treatise writers are decidedly against the trustee in that regard. Moreover, we consider that, as a matter of basic syntax and sentence construction, the "other writing" concept is separate and independent from the various provisions of § 7-3-104. The Official Comment to § 7-9-105(1)(i) states:
 "The term [instrument] as defined in paragraph (1)(i) includes not only negotiable instruments . . . but also any other intangibles evidenced by writings which are in ordinary course of business transferred by delivery. As in the case of chattel paper `delivery' is only the minimum stated and may be accompanied by other steps."
As explained by Steven L. Harris in his article Non-NegotiableCertificates of Deposit: An Article 9 Problem, 29 U.C.L.A. L.Rev. 330 (1981):
 "In addition to . . . article 3 negotiable instruments, `instrument' under article 9 includes certain other writings that meet three requirements: they must evidence a right to the payment of money; they must not be of themselves a security agreement or lease; and they must be of a type which is, in the ordinary course of business, transferred by delivery with any necessary indorsement or assignment. A non-negotiable certificate will meet the first two tests; it evidences a money claim that is not tied to an interest in goods. The transferability requirement, however, is problematic."
29 U.C.L.A. L.Rev. at 370-71 (footnote omitted).
Under UCC § 9-105(1)(i), "[i]t makes no difference whether the particular *Page 819 
certificate of deposit is in negotiable or non-negotiable form. Courts have ruled that Article 9 applies to both negotiable and non-negotiable certificates of deposit because the definition of `instrument' in 9-105(1)(i) is sufficiently broad to include both types." Gerald T. McLaughlin, Security Interest and Deposit Accounts: Unresolved Problemsand Unanswered Questions Under Existing Law, 54 Brook. L.Rev. 45, 50-51 (1988) (footnote omitted). "Instruments that are nonnegotiable and are, therefore, excluded from Article 3 may nonetheless be within the definition of instrument for purposes of Article 9. If a nonnegotiable instrument represents a `right to the payment of money' of a type ordinarily transferred by delivery, it should fall within the Article 9 definition of `instrument.'" Alvin C. Harrell, Security Interests inDeposit Accounts: A Unique Relationship Between the UCC and Other Law, 23 UCC L.J. 153, 167 (1990) (footnotes omitted).
 "While all instruments (save checks) that are otherwise negotiable save for the lack of words of negotiability are cast out of Article 3 . . ., this does not mean that they are cast out of the Code. There are instruments of this type that are in circulation and provision is made in Article 9 for their use as collateral. Thus, the `instruments' category of Article 9 includes not merely `a negotiable instrument [defined in Section 3-104] . . .,' but includes as well `any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment.' (9-105(1)(i).)"
3 Thomas M. Quinn, Quinn's Uniform Commercial Code Commentary and LawDigest, § 9-105[A][5][b], p. 9-191 (2d ed. 2001). "This Article 9 definition of `instrument' [referring to the definition of `instrument' in `revised' Article 9 as set forth in UCC § 9-105(1)(i)] is much broader than the Article 3 definition (the latter requiring negotiability), and therefore the Article 3 case law is not helpful on this point." Ben Carpenter, Security Interest in Deposit Accounts andCertificates of Deposit Under Revised UCC Article 9, 55 Consumer Fin. Law Quarterly Rep. 133, 136 (Spring, Summer, Fall 2001). "`[I]nstruments' in Article 9 are a larger class than negotiable instruments." James J. White Robert S. Summers, Uniform Commercial Code § 24-10(a)2. (4th ed. Supp. 2000). "Most cases uphold the priority rights of a pledgee of a nonnegotiable [certificate of deposit], even though the pledgee could not qualify as a holder in due course." Barkley Clark, The Law of SecuredTransactions Under the Uniform Commercial Code, § 7.09[1][a] (2001).
 "[The] broad definition [in UCC § 9-105(1)(i)] of `instrument' has been held to include negotiable notes, nonnegotiable notes, certificates of deposit, debt securities, and other kinds of nonnegotiable writings that evidence a right to payment of money and are customarily transferred by indorsement and delivery. . . .
 "A writing thus qualifies as an Article 9 instrument in which security interest must be perfected by possession if it meets either of two tests: (1) Is the writing a negotiable instrument under Article 3? (2) Is it a writing that (a) evidences a right to the payment of money, (b) is in the ordinary course of business transferred by delivery and any necessary endorsement, and (c) is not a lease or security agreement?"
1C Peter F. Coogan et al., Secured Transactions Under the UniformCommercial Code § 6A.05[2][b][i] (2002) (footnotes omitted). *Page 820 
 "Courts also regularly hold that nonnegotiable certificates of deposit should be characterized as instruments in which security interests must be perfected by possession. This result seems sensible. Being nonnegotiable, such certificates of deposit do not qualify as Article 9 instruments under the first test of Section 9-105(1)(i) that includes instruments negotiable under Section 3-104. Nevertheless, a nonnegotiable certificate of deposit meets the requirements of an instrument under the residual test of Section 9-105(1)(i) for nontraditional instruments. First, the nonnegotiable certificate of deposit evidences a right to the payment of money, because as a certificate of deposit it will contain `an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money.' Second, a certificate of deposit is ordinarily transferred by delivery of the written document, even if it is not negotiable. Commercial practice ordinarily dictates that the document itself be delivered along with any assignment. Since both prongs of the test are satisfied, a security interest in a nonnegotiable certificate should be perfected only by taking possession of the document.
 "Some courts have taken this conclusion even further, however, and have held that certificates of deposit that are not only nonnegotiable, but also nontransferable should be characterized as instruments for purposes of perfection."
Coogan, § 6A.05[2][b][ii] (footnotes omitted).
 "The test for whether an instrument is within [UCC] subsection 9-105(1)(i)'s coverage is whether the item has gained recognition as one which is ordinarily transferred by delivery with a necessary indorsement or assignment. The drafters included an extremely broad definition to ensure that as new forms of negotiable or quasi-negotiable paper gained currency, they would automatically be included within the definition."
8 William D. Hawkland et al., Uniform Commercial Code Series § 9-105:10 (1993) (footnote omitted).
We find the body of caselaw that has developed concerning the nature of the other-writing category of instrument contained in UCC § 9-105(1)(i) comprises in excess of 20 cases. In their respective briefs, the bank and the association discuss approximately one-half of those cases, which are well-representative of the remainder. The trustee declines to take individual note of any of them, arguing that the cases are inapplicable because "the cases cited by [the bank] address certificates of deposit which we clearly do not have in the present case" (Trustee's reply brief to bank's brief at 11) and "while each of these cases [cited by the association] do find the respective instruments to be negotiable, despite language of non-negotiability, the Court must bear in mind that almost all of the cases involved true `certificates of deposit.'" (Trustee's reply brief to the association's brief at 14.) We do agree that those cases can be summarily dismissed on that basis, because several involve generic "promissory notes," and those that involve a "certificate of deposit" deal with a certificate expressly labeled as nonnegotiable and/or nontransferable.
The trustee unwaveringly maintains in his arguments in his initial brief to this Court and his two reply briefs that the certificate cannot qualify as a "certificate of deposit," because that term is defined by § 7-3-104(j) as requiring "an instrument," and § 7-3-104(b) defines "an instrument" as a "negotiable instrument." The trustee has consistently asserted that because the certificate does not qualify as *Page 821 
a negotiable instrument it cannot be considered a "certificate of deposit." If that be so, then none of the "certificates of deposit" involved in the cases cited by the bank and the association can be distinguished and rejected on the basis that they involve "true" certificates of deposit, inasmuch as each of them involves a nonnegotiable certificate of deposit. Accordingly, we have read and taken into consideration the following cases composing the relevant body of caselaw: In re Omega Envtl. Inc. v. Valley Bank NA, 219 F.3d 984 (9th Cir. 2000); In re Cambridge Biotech Corp., 178 B.R. 34 (Bankr.D.Mass. 1995); Official Comm. of Unsecured Creditors of Investors Lenders,Ltd. v. Field (In re Investors Lenders, Ltd.), 165 B.R. 389
(Bankr.D.N.J. 1994); Panel Publishers, Inc. v. Smith (In re Kelly Group,Inc.), 159 B.R. 472 (Bankr.W.D.Va. 1993); Drabkin v. Capital Bank, N.A.(In re Latin Investment Corp.), 156 B.R. 102 (Bankr.D.C. 1993); KrohOperating Ltd. P'ship v. Barnett Bank of Southwest Florida (In re KrohBros. Dev. Co.), 101 B.R. 114 (Bankr.W.D.Mo. 1989); Coral Petroleum,Inc. v. Paribas (In re Coral Petroleum, Inc.), 50 B.R. 830
(Bankr.S.D.Tex. 1985); White v. Dawson (In re Dawson), 52 B.R. 444
(Bankr.N.D.Ala. 1984); Johnstone v. Mills (In re Columbia PacificMortgage, Inc.), 22 B.R. 753 (Bankr.W.D.Wash. 1982); Cadle Co. v.Citizens Nat'l Bank, 200 W. Va. 515, 490 S.E.2d 334 (1997); CraftProds., Inc. v. Hartford Fire Ins. Co., 670 N.E.2d 959 (Ind.Ct.App. 1996); Kalk v. Security Pacific Bank Washington NA, 73 Wash. App. 13,866 P.2d 1276 (1994); Jamison v. Society Nat'l Bank, 66 Ohio St.3d 201,611 N.E.2d 307 (1993); Bank IV Topeka, N.A. v. Topeka Bank TrustCo., 15 Kan. App. 2d 341, 807 P.2d 686 (1991); Berkowitz v. Chavo Int'l,Inc., 74 N.Y.2d 144, 542 N.E.2d 1086, 544 N.Y.S.2d 569 (1989); Army Nat'lBank v. Equity Devs., Inc., 245 Kan. 3, 774 P.2d 919 (1989); RepublicanValley Bank v. Security State Bank, 229 Neb. 339, 426 N.W.2d 529 (1988);Prudential-Bache Sec., Inc. v. Bartow County Bank, 187 Ga. App. 530,370 S.E.2d 751 (1988); General Elec. Co. v. M C Mfg., Inc.,283 Ark. 110, 671 S.W.2d 189 (1984); Wightman v. American Nat'l Bank ofRiverton, 610 P.2d 1001 (Wyo. 1980); Citizens Nat'l Bank of Orlando v.Bornstein, 374 So.2d 6 (Fla. 1979); First Nat'l Bank in Grand Prairie v.Lone Star Life Ins. Co., 524 S.W.2d 525 (Tex.Civ.App. 1975).
The overwhelming majority of these cases conclude that a promissory note or certificate of deposit that is nonnegotiable and/or nontransferable can nonetheless qualify as an "other writing" under UCC § 9-105(1)(i). Three of the cases, Prudential-Bache Securities, BankIV Topeka, and Cambridge Biotech, conclude that a certificate of deposit explicitly labeled "nontransferable" cannot qualify as an instrument under § 9-105(1)(i). In Prudential-Bache Securities, the certificate of deposit specified simply that it was "nontransferable," without a separate declaration that it was nonnegotiable. The court summarily concluded that such an absolute prohibition on transfer precluded the certificate from consideration as "any other writing" under Georgia's codification of UCC § 9-105(1)(i).
In Bank IV Topeka, the "certificate of deposit" stated on its face that "[t]his certificate is nontransferable." The certificate was also deemed nonnegotiable, because it was not payable to order or to bearer. Relying on Prudential-Bache Securities, the Court of Appeals of Kansas concluded that the certificate would not constitute an "instrument" under Kansas's codification of UCC 9-105(1)(i), containing an alternative "other writing" definition identical to that of Alabama. The court opined that, although there was no indication in the record that could aid it "in *Page 822 
concluding what professionals in the marketplace might make of the document before us" it was the Court's opinion "that, given careful thought, most professionals would not desire to trade in an instrument that is marked `nontransferable.'" 15 Kan. App. 2d at 341,807 P.2d at 691.
In Cambridge Biotech, the bankruptcy court was dealing with a nonnegotiable, nontransferable "time deposit account" and a nonnegotiable, nontransferable "certificate of deposit." Acknowledging that there was a substantial body of caselaw to the contrary, the bankruptcy court chose to rely on Prudential-Bache Securities and Bank IVTopeka, in finding that the documents were per se ineligible for consideration as "any other writing." Rejecting the rationale of other cases that had held that the realities of business practices should control whether a writing meets that standard of transferability, the bankruptcy judge opined:
 "I do not agree that the `realities of business practice' need be consulted. A clear and unambiguous legend on a writing should end a court's inquiry as to how the writing should be classified. It is unfair to expect a lender to look beyond the face of the writing and determine what goes on in the marketplace. A lender should be able to rely on what a writing says. In this case, the writings tell the lender they cannot be negotiated, and that transferability is either prohibited or restricted. Therefor[e], they are obviously not the type of writing transferred in the ordinary course of business."
Cambridge Biotech, 178 B.R. at 38-39.
The majority of the relevant cases have held to the contrary. In reCoral Petroleum, supra, involved a promissory note that was not negotiable because it was not payable to bearer. It also had limitations on its transferability. The court considered the pertinent caselaw, and, citing Harris, Non-Negotiable Certificates of Deposits, supra, noted that "[a] commentator has suggested that the test to determine whether a writing is transferable in the ordinary course of business turns on what professionals ordinarily would do to transfer an interest in the claim evidenced by the writing in question." 50 B.R. at 838. Further referencing Harris's article, the court concluded that "[t]he test turns on findings as to the current usage of the market place. . . . If professionals who deal with a writing attach importance to possession of the writing, then the law likewise should attach significance to possession." 50 B.R. at 838. The court concluded that the note did qualify as an "other-writing" instrument.
In In re Kelly Group, supra, the trustee in bankruptcy conceded that "some nonnegotiable notes may be instruments," but made the distinction that "a nonnegotiable note that is also by its terms made nonassignable is not an instrument." 159 B.R. at 479. The bankruptcy judge rejected that distinction, holding that "a nonnegotiable promissory note, even one that by its terms is not assignable, is an instrument for purposes of Va. Code § 8-9-105(1)(i)." 159 B.R. at 480-81. The court declared that the test for determining whether an item qualified as a § 8-9-105(1)(i) "any other writing" was "whether the item is of a type
which is ordinarily transferred by delivery with a necessary endorsement or assignment." 159 B.R. at 481.
In Latin Investment Corporation, supra, the bankruptcy court analyzed a certificate of deposit bearing the legend "non-negotiable" and "non-transferable." The court framed the issue as whether such a writing "is an `instrument' within the meaning of § 9-105(1)(i) of Article 9 of the *Page 823 
Uniform Commercial Code." 156 B.R. at 104. The court concluded that the requirement in the definition of "other writing" that the writing in question be "of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment,"156 B.R. at 104, serves to "indicate that the realities of the marketplace should control." 156 B.R. at 105. The court noted thatPrudential-Bache Securities and Bank IV Topeka, supra, cited by the parties opposing that contention, "take the particular writing before them at face value. They assume, without any basis for knowing the realities of the marketplace, that a [certificate of deposit] labelled `nontransferable' simply cannot be transferred." 156 B.R. at 105. In rejecting that approach, the court declared:
 "This court believes that the test for transferability should be whether a particular type of writing customarily is transferred by delivery in the ordinary course of business. There is no basis in UCC § 9-105(1)(i) for allowing the legend on a writing to control its transferability. Instead, that section requires that actual business practices be consulted. . . .
 "Moreover, if the business world regularly transfers writings bearing the legend `non-transferable' the court should give that practice legal effect unless doing so is inconsistent with the UCC. The UCC is not intended to thwart usual business practices but to effectuate them. . . . Thus, the realities of business practice should control whether a particular writing meets the standard for transferability found in UCC § 9-105(1)(i). This is the approach advocated by the better reasoned authority."
156 B.R. at 106-07. The court further concluded that "the taking of evidence as to business practices is the only fair way to determine whether a writing is transferable." 156 B.R. at 108.
In Craft Products, Inc., supra, the Court of Appeals of Indiana dealt with a certificate of deposit that could not be classified as a negotiable instrument and that bore the legend "non-transferable." Rejecting the argument that such language was "controlling," the court concluded that "[i]nstead of narrowly looking to the form of the writing, a court should instead look to the realities of the marketplace." 670 N.E.2d at 961. It rejected the per se approach ofPrudential-Bache Securities, supra, and Bank IV Topeka, supra, because, it reasoned, both of those cases had simply made assumptions, taking the wording of the writing at face value, and "[n]either case provides any rationale to support the decision nor looks to the realities of the marketplace." 670 N.E.2d at 961 n. 4. The court concluded that, based on the information in the record, "although the [certificate of deposit] was labeled as non-negotiable and non-transferrable, it clearly was transferrable in the ordinary course of business." 670 N.E.2d at 961.
In In re Omega Environmental, supra, the United States Court of Appeals for the Ninth Circuit upheld the bankruptcy court's finding that a certificate of deposit marked "nonnegotiable," and transferable and assignable only with the issuing bank's prior written consent, was "of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment," 219 F.3d at 986, pursuant to Virginia's codification of UCC § 9-105(1)(i) and, therefore, qualified as an "instrument" under that section. The court noted that "[a]lmost every court to face the issue has rejected the argument that the language on the certificate is controlling, i.e., if a certificate of deposit bears the legend `nontransferable' it cannot be `in ordinary course of business transferred' *Page 824 
as required by the UCC definition of an instrument." 219 F.3d at 987. The court concluded that "[i]f there is evidence that the type of writing at issue is ordinarily transferred in the marketplace by delivery with the necessary endorsement, the requirements of Article 9 are met." 219 F.3d at 987. The court cited approvingly to the statement from Hawkland, § 9-105:10, that "`[t]he test for whether an instrument is within subsection 9-105(1)(i)'s coverage is whether the item has gained recognition as one which is ordinarily transferred by delivery with a necessary indorsement or assignment." 219 F.3d at 987. The court criticized the per se approach taken in Prudential-Bache Securities, BankIV Topeka, and Cambridge Biotech, all supra, on the basis that "[i]gnoring actual commercial practice in interpretating the UCC is contrary to its general policy of effectuating the existing business practices." 219 F.3d at 988 n. 8. The court also noted that "[a]lthough whether the [certificate of deposit] is properly characterized as an `instrument' is a question of law reviewed de novo, whether the [certificate of deposit] is `of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment' is a question of fact reviewed under the `clearly erroneous' standard." 219 F.3d at 986 n. 4. It concluded that the bankruptcy court's finding that the certificate of deposit was of the "type" was not clearly erroneous because the bankruptcy court had "relied upon a declaration by the president of the Bank, the fact that the [certificate of deposit] was actually transferred, and upon the statements in [In re Kelly Group, supra], to conclude that ordinary commercial practice in Virginia is to treat `nontransferable' certificates of deposit as `instruments.'" 219 F.3d at 987.
In Army National Bank, supra, the bank argued that because the promissory notes at issue could not qualify as negotiable instruments under the Kansas counterpart to Alabama's § 7-3-104, they were not "instruments under Article 9." 245 Kan. at 13, 774 P.2d at 926. That is essentially the same argument the trustee makes in this case. The Supreme Court of Kansas rejected the argument, stating that the bank was ignoring the second part of the Kansas counterpart to Alabama's § 7-9-105(1)(i), whereby an instrument is also "any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." 245 Kan. at 13,774 P.2d at 926. Explaining the proper interaction between the article 3 definition of an "instrument" as a "negotiable instrument," and the broader definition of "instrument" under article 9, the court stated: "Both negotiable and nonnegotiable notes are instruments under Article 9. The distinction between the two comes into play where a holder in due course status is asserted pursuant to Article 3. Holder in due course and Article 3 concepts are not applicable to the instant case. The [promissory] notes were instruments within the definition stated in Article 9." 245 Kan. at 13, 774 P.2d at 926.
Likewise, in Republican Valley Bank, supra, the Supreme Court of Nebraska concluded that certificates of deposit marked "non-negotiable" and "not transferable except on [bank's] books," 229 Neb. at 340,426 N.W.2d at 530, although clearly not "negotiable," were nonetheless, "assignable" as collateral for the loans involved. "The certificates are instruments which may be transferred by delivery in the ordinary course of business. [Neb. U.C.C.] § 9-105. A negotiable instrument is assignable, like any other contract right, even though the assignee could never be a *Page 825 
holder in due course." 229 Neb. at 343-44, 426 N.W.2d at 532. To like effect are the holdings in Lone Star Life Insurance, Bornstein,Wightman, In re Columbia Pacific Mortgage, General Electric, In re KrohBrothers, Berkowitz, Jamison, Kalk, Field, and Cadle, all supra.
We conclude that, under the facts certified to us, the certificatecould qualify as a § 7-9-105(1)(i) "any other writing" if under the "realities of the marketplace," i.e., the "current usage of the marketplace," the certificate is "of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." In that regard, we are limiting our opinion to the particular circumstance of a certificate marked "nonnegotiable" but which has no express limitations on transferability. We note the distinctions between "negotiation" and "transfer" stated in § 7-3-201(a) and § 7-3-203(a), respectively.
The bank attached as exhibits to its brief copies of two affidavits it asserts were "placed in the record before the bankruptcy court." One of them is by Jack Harris, who states that he is now, and has been for seven and a half years, "the Operations Office[r] of Farmers Merchant Bank of Waterloo, Alabama, and has been in the banking business for 27-1/2 years." He states that the certificate is the "type of writing [which] in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment." He attests further that "[t]his form of transfer is done regularly by this Bank in its ordinary course of business and of my own personal knowledge is done in the ordinary course of business exactly in the same way by probably every other bank in the country — certainly in the State of Alabama." We make note of this contention simply to note that there apparently will be a factual dispute on this issue. We do not, of course, take note of it for any other purpose, because it is outside the materials submitted with the certified question.
The trustee states in his brief to this Court that he and the bank have filed cross-motions for a summary judgment that were argued before the bankruptcy court on June 23, 2001, but that "no ruling has been issued by the Bankruptcy Court" on the motions, and that that court has rather certified the pivotal question to this Court. Because we are called upon to address only "questions or propositions of law" under Rule 18, Ala.R.App.P., and have no direct knowledge of whether the summary-judgment motions are deemed "under submission" and/or whether the record for the disposition of the motions has been closed by the bankruptcy court, we venture no opinion as to the proper resolution of the fact-based issue whether the certificate qualifies as a § 7-9-105(1)(i) "other-writing" type of "instrument." We naturally leave that determination to the bankruptcy court, having provided our Rule 18 "instructions" concerning the applicable legal standard.
We decline to proceed further along the branches of the "decision tree" the parties would have us pursue to address certain issues that might arise if the bankruptcy judge decides that the realities of the marketplace are such that the certificate does not in fact qualify as a § 7-9-105(1)(i) "instrument." Because the bankruptcy judge may
determine that the certificate is such an "instrument" and therefore that the bank's security interest in it was perfected by possession, our instructions already given would, in that event, turn out to be dispositive. The trustee states in its brief in reply to the amicus curiae brief filed by the association that "[t]he Trustee agrees with the Association's contention that '[t]he determinative issue in this case *Page 826 
is whether the money market certificates are "instruments" under Article 9 of Alabama's Uniform Commercial Code.'" Therefore, we will not analyze the various complicated issues certain of the briefs raise concerning the exclusion of "deposit accounts" from Article 9, so as to invoke the pre-UCC statutory and common-law principles relating to "pledges" and "chattel mortgages," and the security-interest perfection procedures attendant to those types of security interests. In that regard, we refuse comment on the question whether, under the assignment, there was a transfer of title, or retention of title, to the certificate, as would be relevant to differentiating between a pledge and a chattel mortgage. Likewise, we decline to undertake an analysis of "general intangibles" under the catchall provisions of § 7-9-106. Lastly, we do not address the respective arguments of the bank and the association to the effect that the bank has a prioritized interest to the funds represented by the certificate by virtue of a right of set off under 11 U.S.C. § 553(a). We agree with the trustee that this issue is not presented by the certified question. Accordingly, we content ourselves solely with disposition of the legal proposition that is pivotal in the first instance — whether the certificate can qualify, depending upon the facts relating to the "ordinary course of business," as an "instrument" under the "other writing" concept of § 7-9-105(1)(i).
QUESTION ANSWERED.
Houston, See, Lyons, Brown, Johnstone, Woodall, and Stuart, JJ., concur.
Moore, C.J., concurs in the result.